AMOS C. WILSON AND HORACE ENGLAND, MEMBERS OF THE BOARD OF BALLOT COMMISSIONERS OF LOGAN COUNTY

*v.*

THE COUNTY COURT OF LOGAN COUNTY, A PUBLIC CORPORATION, *et al.*

(No. 12569)

Submitted May 3, 1966.        Decision Order May 5, 1966.

Opinion May 24, 1966.

BROWNING, JUDGE, dissenting.

*Phillips & Wilson, Robert D. Phillips,* for relators.

*Oval D. Damron,* Prosecuting Attorney, *W. Bernard Smith,* Assistant Prosecuting Attorney, for respondents.

CALHOUN, JUDGE:

In this proceeding in mandamus, the petitioners, Amos C. Wilson and Horace England, as members of the board of ballot commissioners of Logan County, filed in this Court on April 19, 1966, their petition in which the County Court of Logan County, a public corporation, W. E. Bivens and W. C. Dingess, as commissioners, and Raymond Chafin, as clerk of the county court, were named as respondents.

The prayer of the petition is that a peremptory writ of mandamus be issued to require the County Court of Logan County to reconvene in special meeting and, at such meeting, enter an order "voiding" its prior order of April 5, 1966, by which Logan County was redistricted so as thereafter to be composed of four magisterial districts instead ·

of the three magisterial districts into which the county had theretofore been divided; to require Raymond Chafin, in his capacity as clerk of the county court, to deliver to the petitioners "voting machine labels or other ballots" in his possession which contemplated that the primary election in Logan County thereafter to be held on May 10, 1966, would be on the basis of four rather than three magisterial districts; and further commanding the respondents to attach to the voting machines for the primary election the "voting machine ballot labels certified and ordered by Petitioners," and which were formulated on the basis of three rather than four magisterial districts.

The basic question which was presented for decision in this case was whether the upcoming primary election should be held in Logan County on the basis of three magisterial districts, in accordance with the contention of the petitioners, or on the basis of four magisterial districts, in accordance with the contention of the respondents. A determination of that basic question involved a determination of the validity of the county court's redistricting order of April 5, 1966.

On April 25, 1966, the Court awarded a rule in mandamus returnable on May 3, 1966. On the latter date the case was submitted for decision upon the petition; upon the answer of the respondents to the petition; upon the motion of the petitioners to exclude the answer; upon the demurrer of the petitioners to the answer; and upon briefs and oral arguments of counsel.

On May 5, 1966, the Court entered an order by which the motion to exclude the answer and the demurrer to the answer were severally overruled and by which the Court held and adjudged that the petitioners had not shown a clear legal right to the relief sought by them in their petition and by which the prayer of the petition accordingly was denied. By that order the Court reserved the right later to file a written opinion setting forth its reasons for the decision. This opinion has been prepared and is filed pursuant to the reservation in the order of the right to do so.

On the day of the entry of the order by which the Court set forth its decision of the legal questions arising in the case, Judge Browning filed a dissenting opinion in writing in which he set forth the reasons for his disagreement with the Court's decision.

The procedure in this case is unusual in that the dissenting opinion was prepared and filed in advance of the preparation and filing of the majority opinion. Normally a dissenting opinion is in the nature of an expression of disagreement with matters decided and views stated in the majority opinion. In the unique circumstances of this case, the majority opinion necessarily, to some degree, must assume the nature of a reply to views expressed in the dissenting opinion.

In the dissenting opinion, the disagreement of its author has been stated in language which may be appropriately characterized as scathing and harshly denunciatory, rather than moderate and restrained. We of the majority are charged with having stubbornly emphasized Code, 1931, 7-2-2, and with having refused to give any consideration to applicable constitutional provisions and other pertinent statutes. We are charged with having raised "in hauteur" our "august judicial robes;" with having figuratively stepped over "the feuding politicians" of Logan County; and with having acted "pontifically." If we properly comprehend the effect of this spectacular verbiage, it amounts to a charge that we of the majority have assumed an attitude of hautiness and arrogance; that we have comported ourselves with unbecoming pomposity; and that we have heedlessly flaunted pertinent statutes and constitutional provisions. We are content to rely upon the Court's decision for our vindication.

The dissent seems to imply that this case arises from maneuvering of hostile political factions for personal reasons and for the purpose of avoiding an honest election in Logan County. The opinion states that the people who are responsible for this political maneuvering and consequent flood of litigation constitute a "minute portion" of the citizens and voters and that ninety-nine percent of the sixty-five thousand citizens of Logan County "are law-

abiding, patriotic men and women striving constantly to establish better government" and to elect better men and women to political offices. We do not challenge the correctness of these percentages, though it may be that this and other cases recently in court serve to emphasize the disproportionate influence and potency of the one percent and to furnish a basis for a challenge to the ninety-nine percent, including the author of the dissenting opinion, to exert an influence for good in proportion to their numbers in the political and official life of the county.

We regard with indulgence and charity the fact that the author of the dissenting opinion saw fit to direct such harsh language toward his four associates on the Court because, as the dissenting opinion discloses, he is a native son of Logan County. If one stands too close to a mountain, it is impossible for him to view it in its broad outline and expanse. It may conceivably be that we of the majority, who are not natives or residents of Logan County, have been able to approach a decision of this case in a more objective way than can be expected of a mere human being who, through the years, has lived so close to the situation which gives rise to the series of court cases of a political or factional nature which have arisen in recent months in Logan County.

The motion to strike the answer is based on the fact that the verification of the answer is dated April 2, 1966. This is an obvious typographical error, because the answer replies in detail to allegations of the petition and the petition was verified on April 16, 1966. It is reasonably apparent that, as a matter of fact, the verification should have been dated May 2, 1966, the day before the case was argued and submitted for decision. We are of the opinion that this irregularity is not of such critical character as to require us to exclude the answer from our consideration, especially without giving the respondents leave to correct the obvious error. This is especially true, we believe, because of the fact that the petitioners demurred to the answer and because of the fact that the case was orally argued before the Court on its merits before the motion to exclude was

actually filed. Since this objection was not raised by demurrer, it must be regarded as waived. See *State ex rel. Bika v. Ashworth*, 128 W. Va. 1, 3, 35 S. E. 2d 351, 352; Code, 1931, 56-4-36 and 56-4-65; 71 C.J.S., Pleading, Section 564 (2), page 1137.

The Rules of Civil Procedure do not apply to proceedings in mandamus. R. C. P. 81 (a) (5). The demurrer, therefore, was a proper pleading by which to test the legal sufficiency of the allegations of the answer. Code, 1931, 56-4-36. The demurrer must be treated as having admitted the truth of all matters of fact which were well pleaded in the answer. 6 M. J., Demurrers, Section 28, page 26.

The demurrer charges (1) that all voting precincts in Logan County were abolished by the county court's redistricting order of April 5, 1966, and that no voting precincts were thereafter recreated by the county court in accordance with the provisions of Code, 1931, 3-1-5 and 7, as amended; (2) that the county court could not by its redistricting order, under the provisions of the statute, recreate election precincts because the redistricting order was entered in less than ninety days before the May 10, 1966, primary election; and (3) that the averments of the answer disclose that respondent Raymond Chafin, in his official position as clerk of the county court, did not comply with the laws pertaining to the printing of official ballots for the reason that the answer admits the ordering and receipt by his office of ballots not certified by the board of ballot commissioners and that he intends to use such allegedly improper ballots in the primary election.

The county court's redistricting order of April 5, 1966, was made and entered pursuant to Code, 1931, 7-2-2, which, subject to omission of part thereof which is not deemed to be material, is as follows:

"Each county shall be laid off by the county court into magisterial districts, not less than three nor more than ten in number, and as nearly equal as may be in territory and population. The districts as they now exist shall remain until changed by the county court. The county court may, from time

to time, increase or diminish the number of such districts, and change the boundary lines thereof as necessity may require, in order to conform the same to the provisions of the Constitution of the State.

"Whenever the county court shall deem it advisable to change the boundary line between two or more districts, or to establish a new district out of another or two or more districts, or to consolidate two or more existing districts into one, it may make such change, establishment or consolidation by an order entered of record. * * * But before such districts shall be increased or diminished, or the boundary lines thereof changed, the court shall cause a notice of its intention to do so to be posted on the front door of the courthouse of the county, and at some public place in each district affected thereby, for at least thirty days prior to the term of court at which such action is proposed to be taken."

The statute quoted immediately above grants to county courts, in clear and unqualified language, the power to diminish or to increase the number of magisterial districts and to change the boundary lines of existing districts. The statute does not limit the power of a county court to non-election years. It does not prohibit a county court from taking action under its provisions within any specified time before a primary or general election. On the contrary, Code, 1931, 3-1-7, as amended, authorizes county courts to "change the boundaries of any precinct within such county, or divide any precinct into two or more precincts, or consolidate two or more precincts into one, or change any place of holding elections;" but the statute provides additionally: "No order effecting such change, division, or consolidation shall be made by the county court within ninety days next preceding an election * * *." There is no similar time limitation upon the power of county courts under the statute which deals with changes of magisterial districts. We must assume that the legislature had a reason for placing a time limitation in one statute and not in the other. It is not for us to question the wisdom or expediency of this difference in the two statutes. We cannot read into the magisterial district statute a time restriction on the

power of a county court which was not written into the statute by the legislature.

The magisterial district statute requires a county court to give a prescribed notice "for at least thirty days prior to the term of court at which such action is proposed to be taken." Notice was given by the county court in this instance in conformity with the statutory requirement before the magisterial districts were changed by the county court on April 5, 1966. Nobody appeared before the county court at its meeting held on that date, or at any other time or place, to protest or object in any manner to the entry of the redistricting order. Specifically, neither of these petitioners appeared, no candidate for public office appeared and no member or chairman of any political party executive committee appeared to object to the proposed change or to the timeliness of the proposed change of magisterial districts. The statute contemplates that objections or protests, if any, should have been made on or before April 5, 1966, the date designated for the proposed change of magisterial districts. So far as the record discloses, no objection whatsoever was made at any time, in any manner, by anybody until after the change was made by the entry of the county court's redistricting order. The propriety or legality of the change in magisterial districts is challenged in this proceeding only by the two petitioners as members of the board of ballot commissioners of Logan County. The dissenting opinion assumes to take up the cudgel in behalf of four candidates for justice of the peace. The record does not disclose that they, themselves, are dissatisfied with the redistricting. The dissenting opinion assumes also to speak in behalf of the "65,000 citizens of Logan County," asserting that their rights "have been flagrantly violated." None of that vast number of citizens appeared to protest or to object to the entry of the county court's order of April 5, 1966.

It may be true that the county court chose an inappropriate time for redistricting the county in the light of the nearness to the date for holding the May 10 primary election. This Court has held that the action of a county

court in changing magisterial districts constitutes per-. formance of a legislative or governmental function, rather than a judicial function. *County Court of Mingo County* v. *Bailey,* 97 W. Va. 351, 125 S. E. 253; *State ex rel. Collier et al.* v. *Mingo County Court*, 97 W. Va. 615, 125 S. E. 576. It is not for us to question the exercise of the county court's discretion or to impugn the motives of its members. We can appraise the county court's action only from the standpoint of its legality. Section 27, Article VIII of the Constitution of West Virginia requires that each county shall be laid off in magisterial districts not less than three nor more than ten in number, "and as nearly equal as may be in territory and population." It is conceded that, prior to April 5, 1966, there was a gross disparity or inequality in the population of the three magisterial districts and that the redistricting has created four magisterial districts fairly equal in population. Whatever else may be said of the action of the county court in redistricting the county, it is undeniable that the effect has been to conform to the constitutional provision which contemplates, as nearly as may be, equality in population among the several magisterial districts of Logan County. To this extent, at least, it cannot be denied that the county court has acted in obedience to the command of the Constitution.

Logan County has adopted voting machines for use at all voting precincts within the county, pursuant to the provisions of Code, 1931, Chapter 3, Article 4, as amended. Section 10 provides that the ballot commissioners in any county in which voting machines are to be used in any election shall cause to be printed "ballot labels" for use in the voting machines; and that all such ballot labels "shall be delivered to the clerk of the county court at least fifty days prior to the day of the election in which such labels are to be used." Concerning the nature and content of such ballot labels, the same code section provides that the "labels shall contain the name of each candidate and each question to be voted upon and shall be clearly printed or typed in black ink on clear white material of such size as will fit the ballot frames" of the voting machines. Since the primary election was held on May 10, 1966, the ballot labels were

required to be delivered by the ballot commissioners at least fifty days prior to that date, or not later than March 21, 1966. On March 21, 1966, and thereafter until the petitioners became ballot commissioners on April 1, 1966, Rush Hall and Ray Samson were ballot commissioners for Logan County. During all that period of time, John R. Browning, as clerk of the circuit court, was *ex officio* a member and chairman of the board of ballot commissioners. See Code, 1931, 3-1-19, as amended.

No meeting of the board of ballot commissioners was called or convened to prepare ballot labels to be delivered to the clerk of the county court, pursuant to the statutory requirement. In these circumstances, according to the answer and its exhibits, on or about March 21, 1966, Glenn R. Jackson, a deputy to the clerk of the county court, went to the office of John R. Browning, and informed him that it was necessary that voting machine labels be prepared and delivered. The two men thereupon checked the records in Browning's office and determined what persons had properly qualified as candidates for the forthcoming primary election. After the two men had conferred from time to time, Jackson typed the ballot labels and on March 22, 1966, forwarded them to Casto & Harris, Inc., printers, at their place of business at Spencer, West Virginia, to be printed. The affidavit of Glenn R. Jackson, which is filed as an exhibit with the answer, alleges that this is the same procedure which has always been used in the preparation of voting machine labels in Logan County and the same procedure used by Browning and Jackson for elections in that county in 1964. It will be noted that, to this point, no action whatsoever had been taken by the board of ballot commissioners in relation to the preparation and delivery of the voting machine labels.

On April 5, 1966, the day the county court entered its redistricting order, Jackson called Casto & Harris, Inc., and directed a change in the printing of the ballot labels to conform to the change from three to four magisterial districts. The printed ballot labels were shipped by Casto & Harris, Inc., and received in the office of the clerk of the

county court on April 9, 1966. It is these ballot labels, formulated on the basis of four magisterial districts, which were being placed in the voting machines when this case was decided. Presumably they were used in the voting machines for the May 10, 1966, primary election.

On April 15, 1966, the petitioners, as the new ballot commissioners, delivered to Jackson a "Sample ballot of arrangement on voting machine." This was formulated on the basis of three magisterial districts, though it will be noted that this was ten days after the county court had entered the redistricting order. The board of ballot commissioners, as it was constituted prior to April 1, 1966, did not prepare or deliver to the county clerk's office any ballot labels of any kind or description, though the time required for their preparation and delivery had long since passed when these petitioners became ballot commissioners on April 1, 1966.

In counties in which voting machines are used, a limited number of "printed ballots" are required to be prepared and supplied by the ballot commissioners, in accordance with Code, 1931, 3-5-10, as amended. These printed ballots are used in such counties for absentee voters and for challenged ballots. The statute referred to immediately above provides: "Between the sixtieth and thirtieth days next prior to the date of the primary election, the ballot commissioners of each county shall prepare from the lists and certificates of announcements, as provided in this article, a sample official primary ballot for each party, placing thereon the names of all the candidates of the political party, and, as the case may be, the nonpartisan candidates to be voted for at such primary election." The same section provides for newspaper publication of such sample official primary ballot and that the ballot commissioners shall cause the ballot "to be printed at least thirty days next preceding the date of the election and made ready for delivery to the several precincts along with other election supplies."

The mandamus petition alleges that the petitioners, as ballot commissioners, on April 1, 1966, "certified the Official Ballot" for the primary election and, *on the same date,*

contracted for the printing of such ballots pursuant to Code, 1931, 3-1-21, as amended, which section deals with printed ballots and which has been previously referred to in this opinion. The answer and its exhibits clearly demonstrate the falsity of the allegation that the petitioners on April 1, 1966, contracted for the printing of the "official ballot." The petitioners and John R. Browning, acting as a board of ballot commissioners, directed an *undated* letter to Roscoe Spence, Logan News, Logan, West Virginia, requesting that he print a specified number of ballots on the basis of three magisterial districts. A certified mail certificate discloses that the letter to Spence was actually mailed on April 7, rather than on April 1.

The petitioners and John R. Browning, as the board of ballot commissioners, directed an *undated* letter to Casto & Harris, Inc., at Spencer, West Virginia, by which they undertook to countermand the order for voting machine labels based on four magisterial districts and directed that the labels be printed on a three magisterial district basis. Following is a portion of a reply letter from Casto & Harris, Inc., to John R. Browning which discloses that the petitioners did not contract on April 1, 1966, for the printing of ballot labels:

> "This acknowledges with thanks your undated certified letter postmarked April 7 about the Logan County ballot labels.

> "However, the revised ballot label copy was approved by phone by Mr. Jackson April 5, the labels were printed April 6 and were mailed from here April 8, the same day your letter was received. * * *

> "We are merely election supply printers and have no legal background. In accepting Mr. Jackson's copy we followed a precedent of 25 years or more and, of course, could not then anticipate your instructions received April 8, after the ballot labels were printed and shipped."

While the petition alleges that the "Official Ballot" was "certified" by the petitioners on April 1, 1966, their first day in office as ballot commissioners, the petition does

not allege to whom it was certified. The affidavit of Glenn R. Jackson, filed as an exhibit with and made a part of the answer, states that neither he nor anybody else in the office of the clerk of the county court had in his possession that which petitioners allege to be the "official ballot," prepared on a three magisterial district basis, though affiant stated that he knew that "said document" was being used "by the Circuit Clerk of Logan County for absentee voting * * *." As has been stated previously in this opinion, the alleged "official ballot," was not ordered to be printed until April 7, 1966, after the redistricting order was entered by the county court. Nevertheless, the circuit clerk's office continued to send the three magisterial district ballots to absentee voters, irrespective of and apparently in defiance of the county court's redistricting order of April 5, 1966. It clearly appears also that the board of ballot commissioners, by a letter of April 7, 1966, directed the printing of the ballots irrespective of and apparently in defiance of the action of the county court in entering its redistricting order. The board of ballot commissioners had ample opportunity to cause the printed ballots to conform to the redistricting order and also to conform to the ballot labels which had been ordered and printed.

The county court's order of April 5, 1966, states that "the magisterial districts as in effect prior to this date are abolished and hereafter the magisterial districts and their boundaries shall be as follows:". It is asserted by the petitioners that the order "abolished" the three magisterial districts; that the voting precincts were integral parts of the magisterial districts and therefore were also abolished by the county court's order; and that the voting precincts could not at that time be recreated or reestablished because of the fact that Code, 1931, 3-1-7, as amended, provides that no order changing the boundaries of any precinct, or dividing a precinct into two or more precincts, or consolidating two or more precincts into one, or changing any place of holding elections "shall be made by the county court within ninety days next preceding an election * * *." We do not believe this contention is sound. It apparently assumes that the effect of the county court's order was

to cause a hiatus and that there resulted a period of time, however brief, during which there were no magisterial districts or election precincts in Logan County. The choice of language in the order may have been unwise or inappropriate, but, as a matter of fact, the county court has no right or power to enter an order which would completely abolish all magisterial districts and all voting precincts in the county. The order states that the action of the county court was being taken pursuant to and in accordance with the provisions of Article VIII, Section 27 of the Constitution of West Virginia, and Code, 1931, 7-2-2. Both the statute and the constitutional provision contain a mandatory requirement that each county shall be laid off into magisterial districts. The county court is bound by that mandatory requirement and has no power to abolish all magisterial districts and leave the county for any period of time without any such districts. The obvious purpose and effect of the county court's order were merely to redistrict the county.

Prior to the entry of the county court's redistricting order, Logan County had three magisterial districts as follows: Chapmanville with ten precincts; Triadelphia with thirteen precincts and Logan with forty precincts. As a result of the redistricting the four magisterial districts are as follows: Guyan with nineteen precincts; Triadelphia with thirteen precincts; Logan with thirteen precincts; and Island Creek with eighteen precincts. The voting precincts, as a consequence of the redistricting, were not changed in respect to their total number, their locations or their boundaries. Voters vote at the same precincts and at the same locations as before.

The voting machine labels list the same candidates for office as are listed on the paper ballots. The redistricting did not disfranchise a single voter or result in denial of anybody's right to be a candidate in the May 10, 1966, primary election. The only material difference between the voting machine labels and the printed ballots is that the former were formulated on the basis of four magisterial districts and the latter were formulated on the basis of three magisterial districts. The basic function of a board

of ballot commissioners is to determine and properly certify the names of persons who have qualified to be candidates. Concerning that matter, there is no controversy. As we have observed previously, the candidates are the same on the voting machine labels and on the printed ballots.

The dissenting opinion lists eleven constitutional provisions and states that the action of the county court is violative of each of them. At that point the dissenting opinion is lacking in specificity. It does not state precisely how these constitutional provisions have been violated. We have, nevertheless, carefully considered each of the eleven constitutional provisions. We are of the opinion that the action of the county court in redistricting the county is not violative of any constitutional provision.

The action of the county court in redistricting the county was lawful. The board of ballot commissioners has no power or authority to override the county court's action in this respect. The board of ballot commissioners had the right and power to formulate a proper paper ballot and to have it printed for use in the primary election, but it had no lawful right or authority to formulate such a ballot on the basis of three magisterial districts for the primary election to be held in a county having four magisterial districts. The ballot formulated and printed on the basis of three magisterial districts in a four-district county was not a proper ballot. The petitioners, therefore, have not shown a clear legal right to the relief sought by them in this case.

For reasons stated in this opinion, the Court entered its order of May 5, 1966, by which the motion to exclude the answer and the demurrer to the answer were overruled and by which a peremptory writ in mandamus was denied.

*Writ denied.*

BROWNING, JUDGE, dissenting:

I dissent. Deferentially and respectfully, but with a feeling of judicial shock, do I find myself again in disagreement with the majority of this Court upon the principal issues which have been before this Court on three or four occasions

arising out of the magisterial redistricting of Logan County by the county court in a two to one decision. This Court by a vote of three to one, Judge Calhoun being absent and the writer disagreeing with the majority, refused on the 31st day of March, 1966, to grant a temporary injunction and refer the case to the Judge of the Circuit Court of Logan County for the taking of evidence and a decision as to the validity of the action of the county court in redistricting the county at the time when such action was taken. It is my opinion that we would have avoided not only the confusion we are now facing but much confusion following the primary election by not taking that palpably erroneous position. It is not often that a court gets an opportunity so soon to right a wrong that it has committed. This Court has that second chance in this proceeding. The majority stubbornly and persistently points its finger to Chapter 7, Article 2, Section 2, of the Code, as amended, which gives a County Court the power to redistrict a County and refuses to look to any other applicable statutory or constitutional provision with the same result that the blind man obtained when he clung only to the trunk of the elephant and refused to admit that it had any other parts. Code, 3-1-21, as amended, and 3-4-10, as amended, respectively, unequivocally give the board of ballot commissioners of Logan County the power to compose an official ballot, and ballot labels for use in voting machines, for the primary election to be held next Tuesday. The county court and its clerk, both respondents, have refused to accept that ballot and have prepared ballots or ballot labels of their own without any authority to do so and this Court supinely refuses to interfere. The ballot commissioners are required to prepare such official ballot or ballot labels subsequent to the last day for filing by candidates for office and that is a mandatory duty with which they can be forced to comply. They have done so without any mandatory action by this or any other court. They have no authority to prepare an official ballot for the primary election of Logan County which shows more than three magisterial districts therein because as of the date that this ballot must be prepared there were only three magisterial districts in Logan County. Thus, if we went

no further, it is obvious that the action of the county court is invalid. Even though they have the power to redistrict they do not have the power to do so in violation of the electoral statutes and their action in so doing is also in violation of the following provisions of the constitution of this state and of the United States: Article III, Sections 3, 10 and 17; Article IV, Sections 1, 2 and 11; Article VIII, Section 27; and, Article IX, Section 2, W. Va. Const.; the 14th, 15th and 19th Amendments to the Const. of the U. S. These constitutional provisions generally are directed to the conduct of free and orderly elections and the enfranchisement of the citizens of the state and specifically to the election of justices of the peace and constables in each magisterial district. The action of the county court in redistricting thirty-five days previous to the primary election has thus rendered these mandatory constitutional provisions impossible of accomplishment.

For at least one other reason the action of the county court is in violation of several of the above constitutional provisions. That order "abolished" the three existing magisterial districts of Logan County and then purported to create four new districts. As final proof that that is true they changed the name of the district formerly known as Chapmanville and renamed it Guyan District. If it had not been a new district the name could not have been changed without the order so providing in accordance with the pertinent section of the code. Voting precincts are integral parts of magisterial districts and cannot exist otherwise. Code, 3-1-5, as amended, provides:

"The precinct shall be the basic territorial election unit. The *county court shall divide each magisterial district of the county into election precincts, shall number the precincts, shall determine and establish the boundaries thereof,* and shall designate one voting place in each precinct, which place shall be established as nearly as possible at the point most convenient for the voters of the precinct. Each magisterial district shall contain at least one voting precinct and each precinct shall have but one voting place therein. . . ." (Italics supplied.)

Code, 3-1-7, as amended, then provides that, subject to the foregoing, a county court may divide, consolidate or change the boundaries of a precinct as the public convenience may require, but that "No order effecting such change, division, or consolidation shall be made by the county court within ninety days next preceding an election. . . ." When the county court abolished the three magisterial districts of Logan County on the 5th day of April, 1966, they also abolished all of the voting precincts in those three magisterial districts. While the order which is a part of the record in this case shows that the county court attempted to create four new magisterial districts, it created not one voting precinct in either of the four new magisterial districts and no one, including this Court, can create a voting precinct other than the members of the county court of a county. Therefore, if this Court permits this election to be held in Logan County on the 10th of May it is very likely that we will have to hold after the election that there were no voting precincts in Logan County on Tuesday, May 10, 1966, and therefore no valid election was held therein.

The solution to this dilemma is obvious and this is it: Grant the prayer of the petition of the ballot commissioners and direct the respondents to remove from the voting machines of Logan County the invalid ballots and/or labels which the respondents illegally adopted and require them to place instead upon the voting machines the only official ballot in existence—the one adopted by the ballot commissioners—and no question can thereafter arise as to the validity of the May 10th primary election. It is true that in order to do that this Court will have to find that the action of the County Court of Logan County of April 5, 1966, was invalid because of its interpretation and application of the pertinent statutory provisions at the time and under the circumstances when the court acted. The statutes are clear that: candidates for public office in this state in a primary election must file on or before the first Saturday of February next preceding an election and many candidates did file as of that date, including four candidates for nomination for the office of justice of the peace of

Chapmanville District. The record shows that five hundred or more absentee voters in Vietnam and other places have exercised their right to cast ballots and, as provided by the law, they have voted them upon the only official ballot that exists in Logan County, the one adopted by the ballot commissioners. Certainly the absentee voters who reside in the ten precincts that were illegally taken from Logan District and added to what was then Chapmanville District will have no opportunity to vote for candidates for district offices because those candidates do not appear upon the ballot inasmuch as they were not a part of Chapmanville District at the time the official ballot was printed.

While the majority might have, from their viewpoint, justified their refusal of the temporary injunction prior to the invalid act of the respondents on April 5, 1966, on the ground that viewed prospectively it might be assumed that respondents in that proceeding would not perform an unconstitutional act, there is no such presumption permissible in this proceeding. The respondents now *have* performed the illegal act and the record shows such for all men to see.

It is true, of course, that when an administrative body has the unequivocal power under a valid statute to perform an act the motives of its members, however improper or corrupt they may be, are not controlling. However, the rights of a large portion, almost all, of the 65,000 citizens of Logan County have been flagrantly violated and it is to *them*, not primarily the members of the two political factions, that this Court owes a paramount obligation to perform its constitutional duties. Its members should not raise in hauteur their august judicial robes, figuratively step over the feuding politicians pontifically murmuring "a curse upon both of your houses" or "stew in your own juices," and after the election we will try to determine in future proceedings who was nominated or elected.

If my brethren are of the opinion that the purpose of the maneuvering and litigation by the political factions was not to secure an honest election in Logan County but for reasons personal to themselves, I am completely in agree-

ment with them. But these factions compose only a minute portion of the citizens and voters of Logan County. Ninety-nine per cent of the people of Logan County are not professional politicians. On the contrary, they are law-abiding, patriotic men and women striving constantly to establish better government in that county by electing better men and women to political offices. If they are completely confused as to why this Court refuses them relief I, who unofficially am one of them, join in their perplexity. The power given to a county court to redistrict by Code, 7-2-2, as amended, is not unlimited but must be exercised so as to conform to the constitutional provisions hereinbefore quoted and in harmony with existing statutory law.

For the reasons stated I would grant the prayer of the petition, direct the respondents to use the official ballot, place the same upon the voting machines, and find that the action of the county court in attempting to redistrict Logan County thirty-five days previous to an election was invalid and of no effect.