STATE *ex rel.* WILLIAM T. BROTHERTON, JR., *etc., et al.*

*v.*

C. A. BLANKENSHIP, CLERK, *etc.*

(No. 13369)

Submitted June 12, 1973.          Decided July 3, 1973.

Opinion Filed October 23, 1973.

Dissenting Opinions April 9, 1974 and July 30, 1974.

*Vincent V. Chaney, George S. Sharp* for relators.

*Jack M. McCarty* for respondent Blankenship.

*John E. Carrigan, W. Victor Ross* for intervenor respondent Moore, Governor.

CAPLAN, JUSTICE:

Invoking the original jurisdiction of this Court, the petitioners, William T. Brotherton, Jr., as a Member and President of the Senate of West Virginia, and Lewis N. McManus, as a Member and Speaker of the House of Delegates of West Virginia, and as citizens and taxpayers of said State, seek a writ to require the respondent, C. A. Blankenship, Clerk of the House of Delegates, and as such, the keeper of the rolls and custodian of the acts and joint resolutions of the Legislature, "to publish the true Budget Act in such manner as to include the full and lawful amounts appropriated by the Legislature without the void deletions, reductions and vetoes

attempted by the Governor and without giving effect to the unlawful and unconstitutional additions of figures and language and amendments and changes in the Budget Bill attempted by the Governor and to furnish Petitioners true copies of the Budget Act as so published * * * ."

On June 1, 1973, the same day upon which the petition was filed, this Court, upon said petition together with the exhibits filed therewith, issued a rule returnable June 5, 1973. The Honorable Arch A. Moore, Jr., Governor of the State of West Virginia, on June 4, 1973, filed a motion praying that he be granted leave to intervene in this action as a party respondent. Upon the return day of the rule that motion was granted and, upon motion of the intervenor, the hearing on the rule was continued until June 12, 1973. On the latter date, upon the petition and exhibits, the demurrer and answer of the respondent, a plea in abatement of the intervenor and response thereto, the intervenor respondent's demurrer to the petition and demurrer to respondent's answer, and upon briefs and arguments filed and made by counsel for the respective parties, this case was submitted for decision.

On the 3rd day of July, 1973, this Court, by order, filed its decision in this case granting the relief prayed for in certain instances and denying such relief in others. This opinion is now filed for the purpose of stating the reasons for the holdings in the aforesaid order.

As clearly indicated by the above quoted language in the prayer of the petition, the question presented in this litigation is whether the action of the Governor in relation to the Budget Act, as enacted by the Legislature, is valid. If his action is valid then the Budget Act as altered by him shall be published as the lawful budget for the state for the 1973-1974 fiscal year. If, however, it be determined that the action of the Governor is invalid, wherein such invalidity appears, the Budget Act, as enacted by the Legislature, shall be published as the lawful budget.

The Legislature, on April 17, 1973, passed Enrolled Committee Substitute for Senate Bill No. 51, sometimes referred to herein as the Budget Bill, providing the budget of the State of West Virginia for the fiscal year 1973-1974. Thereupon, it adjourned *sine die*, after which the said bill was presented to the Governor for his consideration in accordance with the provisions of the Constitution of the State of West Virginia. On April 21, 1973 the Governor signed the Budget Bill as "approved with reductions" and filed it in the office of the Secretary of State.

Due to the manner in which the Governor altered the Budget Bill, after its passage by the Legislature, the following issues are presented for resolution in this proceeding:

1. Is this Court disqualified to hear and determine this case?

2. Does the Governor have constitutional authority to disapprove or reduce items or parts of items contained in the Budget Bill enacted by the Legislature relating to the judiciary department?

3. Does the Governor have constitutional authority to disapprove or reduce items in the Budget Bill, after passage by the Legislature, relating to constitutional officers, in a manner and to such extent as would render their offices and functions inoperative?

4. Does the Governor have authority to alter budgetary acts upon receipt of the Budget Bill, after passage by the Legislature, by striking parts of items therein and in lieu thereof, inserting a lump sum figure equal to the sum of the parts of items stricken?

5. Does the Governor have the authority to reduce to zero funds provided in the budget for state aid to schools?

A preliminary issue to be decided is whether this Court is disqualified to hear and determine this case. This is prompted by the fact that certain budget items

relating to this Court were reduced by the Governor. It is well settled that a judge, to be disqualified to hear and determine an action, must have a pecuniary or property interest in the matter to be decided. A remote or possible interest or merely an interest in a legal question will not warrant disqualification. 46 Am. Jur. 2d, *Judges,* Sections 98 and 99; 48 C.J.S., *Judges,* Section 79. *Cheuvront v. Horner,* 62 W.Va. 476, 59 S.E. 964; *City of Grafton v. Holt, Judge,* 58 W.Va. 182, 52 S.E. 21.

The interest of the members of this Court in the outcome of this action is, at most, remote and indirect. The only budget items relating to this Court which were reduced by the Governor were those pertaining to equipment and to personal services for personnel of the state law library. In neither of these items do the judges have a pecuniary or property interest. The salaries of the judges are not effected by this litigation. The only other item involved is that designated "criminal charges" contained in Account No. 111, Judicial-Auditor's Office. The funds in this account are for certain expenses incurred, not by this Court, but for the operation of the courts throughout the entire state. Certainly the members of this Court have no pecuniary or property interest in the outcome of this case in relation to this item of the budget.

Even if the members of this Court have a disqualifying interest, which premise we reject, they would be required, of necessity, to hear and decide this case. It is clearly the majority view that the rule of disqualification must yield to the demands of necessity. In other words, our law provides for no other tribunal or for a substitution of judges to hear and decide the controversy, making it necessary that we so act. As succinctly reflected in 46 Am. Jur. 2d, *Judges,* Section 89, a judge or a court must so act if his or its "jurisdiction is exclusive and there is no legal provision for calling in a substitute, so that his refusal to act would destroy the only tribunal in which relief could be had and thus prevent a determination of the proceeding." See *Myers v. Circuit Court,* 64 W.Va.

444, 63 S.E. 201; *Stafford v. County Court*, 58 W.Va. 88, 51 S.E. 2; *Forest Coal Co. v. Doolittle*, 54 W.Va. 210, 46 S.E. 238; *Wheeler v. Board of Trustees*, 200 Ga. 323, 37 S.E.2d 322; and *Evans v. Gore*, 253 U.S. 245, 40 S. Ct. 550, 64 L. Ed. 887.

In view of the principles stated above and noted in the cited authorities, this Court will proceed in the consideration of this controversy and render a decision herein.

The first issue relating to the merits of this litigation is whether the Governor possesses the constitutional authority to disapprove or reduce items or parts of items contained in the Budget Bill enacted by the Legislature which relates to the judiciary department. Giving rise to this controversy is certain language in Article VI, Section 51 of the Constitution of West Virginia. Said Section 51 was completely rewritten and was submitted to a vote of the people in 1968, at which time it was ratified and adopted as a part of our Constitution, becoming known as the "Modern Budget Amendment".

Section 51 provides the manner in which the budget for the operation of our state government is formulated. Bringing in to ready focus the issue presented for resolution is the fact that under the budget amendment prior to 1968 the Governor had no right of veto. When the Budget Bill was passed by the Legislature it became the budget for the operation of state government without any action by the Governor. Under the Modern Budget Amendment the Governor has the responsibility of presenting the budget to the Legislature and upon its passage, before it becomes a law, may act upon it as provided therein.

In order to determine the extent of authority afforded by the Governor it is essential that we examine said Section 51 and, in relation thereto, the action taken by him where appropriations for the judiciary department are concerned.

Subsection D, paragraph (11) of Article VI, Section 51 provides:

> "Every budget bill or supplementary appropriation bill passed by a majority of the members elected to each house of the legislature shall, before it becomes a law, be presented to the governor. The governor may veto the bill, or he may disapprove or reduce items or parts of items contained therein. If he approves he shall sign it and thereupon it shall become a law. The bill, items or parts thereof, disapproved or reduced by the governor, shall be returned with his objections to each house of the legislature."

Account No. 110 of the Budget Bill, which provides the budget for the Supreme Court of Appeals, contains a line item designated "Equipment" and a figure therefor in the sum of $505,500.00. This amount was certified by the Clerk of the Supreme Court of Appeals to the Auditor and by the Auditor to the Governor. In acting upon the Budget Bill upon its submission to him, the Governor reduced the above figure to $130,500.00 and stated his reason therefor in his letter to the Secretary of State when the Budget Bill was filed in that office as required by law.

Account No. 111, designated "Judicial-Auditor's Office", contains an item called "Criminal Charges" and a figure therefor in the sum of $640,000.00. This figure was stricken by the Governor and his reason therefor was contained in the letter alluded to above. The amount provided in the Budget Bill for personal services for the State Law Library, Account No. 114, was reduced by $5,000.00 by the Governor and his reasons therefor were similarly stated. Thus, squarely presented is the question of whether paragraph (11), quoted above, gives the Governor unlimited veto power, thereby permitting him to veto or reduce the appropriations submitted for the judiciary department.

It is the position of the intervenor that the language of paragraph (11) is clear and unambiguous and that it

should be applied without construing it. By such application, he contends, it is clear that his authority to reduce items or parts thereof applies to the judicial branch of the government as well as to the executive and legislative branches.

Questions of constitutional construction are in the main governed by the same general rules as those applied in statutory construction. 16 AM. JUR. 2d, *Constitutional Law*, Section 59. The fundamental principle in constitutional construction is that effect must be given to the intent of the framers of such organic law and of the people who ratified and adopted it. *Flesher v. Board of Review, West Virginia Department of Veterans' Affairs,* 138 W.Va. 765, 77 S.E.2d 890; *Morgan v. O'Brien,* 134 W.Va. 1, 60 S.E.2d 722; 16 AM. JUR. 2d, *Constitutional Law,* Section 64. If the language of a constitutional provision is plain and unambiguous it is not subject to judicial interpretation, the intent of the framers and the people being readily ascertainable therefrom. When an ambiguity appears, however, ordinary principles employed in statutory construction must be applied to ascertain such intent. It must, therefore, first be determined whether the constitutional provision in question is imbued with ambiguity.

We cannot accept the view expressed by the intervenor wherein he insists that the plain language of paragraph (11) alone unquestionably relieves it of all ambiguity. To the contrary, ambiguity of statutes may arise otherwise than from fault of expression. Though the meaning may appear to be clear a latent ambiguity can nonetheless exist. "An ambiguity justifying the interpretation of a statute, is not simply that rising from the meaning of particular words, but includes such as may arise in respect to the general scope and meaning of a statute when all its provisions are examined." 50 AM. JUR., *Statutes,* Section 226. *Coosaw Mining Company v. South Carolina,* 144 U.S. 550, 36 L. Ed. 537, 12 S. Ct. 689. See *State v. Rawson,* 210 Ore. 593, 312 P.2d 849 and *Town of Clayton v. Colorado & S. Ry. Co.,* 51 F.2d 977.

The specific language to which reference is made in the instant case is contained in paragraph (11) of said Section 51 and reads as follows: "The governor may veto the bill, or he may disapprove or reduce items or parts of items contained therein." Although the language read out of context appears to be clear, as noted in the foregoing authorities, Section 51 of Article VI of our Constitution must be considered in its entirety. The several sections thereof are *pari materia* and must be read together to ascertain its intent.

The judiciary department, relative to its budget, is mentioned in four separate paragraphs of Section 51. These paragraphs where pertinent read as follows:

"(3) Each budget shall embrace an itemized estimate of the appropriations, in such form and detail as the governor shall determine or as may be prescribed by law: * * * (c) for the judiciary department, as provided by law, certified to the governor by the auditor; * * * ."

"(5) The legislature shall not amend the budget bill so as to create a deficit but may amend the bill by increasing or decreasing any item therein: Provided, that no item relating to the judiciary shall be decreased, * * * ."

"(9) * * *The estimates for * * * the judiciary, as provided by law, certified by the auditor, shall be transmitted to the governor in such form and at such times as he shall direct, and shall be included in the budget."

"(10) The governor may provide for public hearings on all estimates and may require the attendance at such hearings of representatives of all agencies and all institutions applying for state moneys. After such public hearings he may, in his discretion, revise all estimates except those for the legislative and judiciary departments."

In at least two of the above quoted paragraphs of Section 51 it is specifically and forcefully directed that the appropriations for the judiciary shall not be reduced.

Paragraph (5) provides that the Legislature shall not reduce any item relating to the judiciary. Paragraph (10) prohibits the Governor from revising the estimates of the judiciary. We are cognizant of the fact that the limitation upon the Governor in the latter paragraph relates to estimates rather than to the budget as enacted by the Legislature. However, in view of all of the prohibitions, in said Section 51, against altering the appropriations of the judiciary which are submitted *as provided by law* and *as certified to the Governor by the Auditor,* we find that the language of paragraph (11), relative to the Governor's authority to reduce such appropriations, is of doubtful meaning and is uncertain. In this circumstance, as aforesaid, we found it necessary to examine all sections of the subject amendment. Upon such examination and thorough consideration thereof we find that an ambiguity exists. As noted in *Coosaw Mining Company v. South Carolina, supra.* "The ambiguity here referred to is not simply that arising from the meaning of particular words, but such as may arise, in respect to the general scope and meaning of a statute, when all of its provisions are examined." The ambiguity in the instant case is not simply that arising from the words, "The governor may veto the bill, or he may disapprove or reduce items or parts of items contained therein", but such as may arise, in respect to the general scope and meaning of Section 51, when all of its provisions are examined.

The polestar in the construction of constitutions is the ascertainment of and giving effect to the intent of the framers of a constitution and of the people who adopted it. In accomplishing this it is the court's duty to have recourse to the whole instrument. Only in this manner can the intent be ascertained and this is especially so when, as here, a latent ambiguity exists. We are fully cognizant of the language contained in paragraph (13) of Section 51 which reads, in part, "In the event of any inconsistency between any of the provisions of this section and any of the other provisions of the Constitution, the provisions of this section shall

prevail." We are also aware of the intervenor's contention that by reason of the immediately above quoted language, Section 51 prevails over Article V, Section 1, which provides for the separation of powers. We do not agree, however, that in an endeavor to ascertain the intent of Section 51, the Court is precluded from considering the provisions of Article V, Section 1 of our Constitution or any other provision of that instrument.

In construing Section 51 to determine if its provisions afford to the Governor the power to reduce ·items in the budget relating to the judiciary, it is pertinent to examine the budget making process provided in said section. The Modern Budget Amendment prescribes four distinct steps in the enactment of a budget into law. First, the Governor is charged with the responsibility to prepare the budget and present a Budget Bill to the Legislature. In so doing the chief executive officer may require representatives of all agencies and all institutions applying for state moneys to present their estimates at public hearings. Thereafter, he may "revise all estimates except those for the legislative and judiciary departments." It is significant to note at this point that the Governor is totally without authority to revise the estimate of the judiciary department.

The second step in the passage of the Budget Bill is the consideration thereof by the Legislature. The Legislature may increase or decrease any item therein, except "that no item relating to the judiciary shall be decreased." Most significant is the mandatory language emphatically prohibiting the Legislature from reducing any budgetary item of the judiciary.

When the Legislature passes the Budget Bill and presents it to the Governor the third step in the budget making process comes into play. As provided in paragraph (11) of Section 51, the Governor's veto power may then be employed as to the whole bill or he may disapprove items or parts of items contained therein. The fourth step, not material here, consists of the Legislature's consideration of the Governor's veto.

The journey taken by a Budget Bill, from its formulation to its enactment into law, well demonstrates the great detail in which it is considered. It is thoroughly studied and considered four times—twice by the Governor and twice by the Legislature (if it acts upon the Governor's veto). In each of the first two steps unmistakable language admonishes the legislative and executive branches that neither may decrease the appropriation presented by the judiciary department. Only in the third step is this admonition not expressed. It is the absence of this admonition upon which the intervenor relies.

In determining this issue it is pertinent to look at the posture of the Budget Bill relating to the judiciary when it was delivered by the Governor to the Legislature and again when it was presented to the Governor by the Legislature after passage. It necessarily comes back to the Governor in the exact posture and amount as it was when he delivered it to the Legislature. It cannot be otherwise, for the Legislature is expressly forbidden to decrease any item relating to the judiciary. Why, then, would the framers of our Constitution and the people who adopted it preclude any action by the Governor on any item relating to the judiciary and require him to deliver the Budget Bill to the Legislature in that posture, knowing full well that the Legislature cannot decrease such item, and then when it is returned to him, unchanged, permit him to reduce it? To permit the Governor to so act at that stage of the budget making process defies logic and reason. It appears clear that if such were intended the Governor would have been afforded the opportunity to reduce the items relating to the judiciary before he delivered the Budget Bill to the Legislature. That he was not afforded such an opportunity is unmistakably clear and further confirms our opinion that the Constitution does not grant to the Governor the power to reduce the budget enacted by the Legislature as it relates to the judiciary department.

Although we believe that the foregoing consideration of the authority granted the Governor by said Section 51

suffices to support the conclusion reached, a further compelling reason for denying to the Governor the power to disapprove or reduce budgetary items relating to the judiciary after their enactment by the Legislature under Section 51 becomes evident upon thorough and mature consideration of the political maxim that the legislative, executive and judicial departments of government ought to be separate and distinct. This political maxim—the separation of powers—is embodied in Section 1, Article V of our Constitution and reflects the governmental pattern, not only of every state of our Union, but also of the federal government.

Providing for the separation of the several branches of government, Article V, Section 1 of our Constitution reads:

> "The legislative, executive and judicial departments shall be separate and distinct, so that neither shall exercise the powers properly belonging to either of the others; nor shall any person exercise the powers of more than one of them at the same time, except that justices of the peace shall be eligible to the legislature."

From the time of its adherence to by Montesquieu, the author or at least an early supporter of the concept of separation of powers, the political merit of that design of government has not been seriously questioned. *Hodges v. Public Service Commission,* 110 W.Va. 649, 159 S.E. 834; *Kilbourn v. Thompson,* 103 U.S. 168, 26 L. Ed. 377. That concept was invoked in the early consideration of the formulation of our federal Constitution. Reflecting the import which he attributed to the concept of separation of powers in government, James Madison, in support of the proposed Constitution, wrote: "The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny. * * * where the *whole* power of one department is exercised by the same hands which possess the *whole*

power of another department, the fundamental principles of a free constitution are subverted." Speaking of the judiciary, Madison, quoting Montesquieu, wrote: " 'Were it [judicial power] joined to the executive power, *the judge* might behave with all the violence of *an oppressor.*'" THE FEDERALIST PAPERS, HAMILTON, MADISON AND JAY (Rossiter, 1961).

Commenting on the relationship between the three recognized branches of government and the urgency of maintaining a wholly independent judiciary, Alexander Hamilton, in Essay No. 78 of THE FEDERALIST PAPERS, noted: "The executive not only dispenses the honors but holds the sword of the community. The legislature not only commands the purse but prescribes the rules by which the duties and rights of every citizen are to be regulated. The judiciary, on the contrary, has no influence over either the sword or the purse; no direction either of the strength or of the wealth of the society, and can take no active resolution whatever. It may truly be said to have neither FORCE nor WILL but merely judgment; and must ultimately depend upon the aid of the executive arm even for the efficacy of its judgments."

With the real affirmative powers of government reposing in the hands of the executive and legislative branches, it becomes urgent that the judiciary department, one function of which under our fundamental law is to prevent encroachment by the other two branches, remains free and completely independent. As noted by MONTESQUIEU in SPIRIT OF LAWS, Vol. 1, page 181: "* * * there is no liberty if the power of judging be not separated from the legislative and executive powers." Thus, judicial independence is essential to liberty—lest the executive sword become a "Sword of Damocles", precariously and intimidatingly suspended over the judicial head and the legislative law making power be used to usurp the rights granted by the Constitution to the people.

While advocating the view that the Governor, under the authority granted him under Section 51, could, without

limitation, reduce or disapprove the budget of the judiciary department, counsel for the intervenor argued that it was ridiculous to even consider that he would act in such manner as to render such department inoperative. We contemplate no such action by the Governor. However, our government is a government of laws, not of men, and in prescribing guidelines for its operation all contingencies must be considered. The true meaning of the law must prevail—not what an individual holding a particular office may or may not do thereunder. To adopt the view of the intervenor, a Governor could effectively curtail or even eliminate the legislative and judicial branches. Though such action by a Governor is most unlikely, we cannot subscribe to an interpretation of the Modern Budget Amendment under which that contingency is a possibility.

In a recent line of cases the courts have held generally that the judicial branch has the inherent power to determine what funds are necessary for its efficient and effective operation. So holding, the Court, in *Commonwealth ex rel. Carroll v. Tate, Mayor,* 442 Pa. 45, 274 A.2d 193 (1971) said: "If a Court is unable to provide an efficient administration of Justice because of insufficient funds * * * then our whole system of Justice and its administration will undoubtedly be greatly impaired if not destroyed." See *Leahey v. Farrell,* 362 Pa. 52, 66 A.2d 577 (1941).

In *O'Coin's Inc. v. Treasurer of County of Worcester,* 287 N.E.2d 608 (Mass. 1972) the Court reasoned: "It is axiomatic that, as an independent department of government, the judiciary must have adequate and sufficient resources to ensure the proper operation of the courts. It would be illogical to interpret the Constitution as creating a judicial department with awesome powers over the life, liberty, and property of every citizen while, at the same time, denying to the judges authority to determine the basic needs of their courts as to equipment, facilities and supporting personnel. Such authority must

be vested in the judiciary if the courts are to provide justice, and the people are to be secure in their rights, under the Constitution." See *Carlson v. State ex rel. Stodola,* 247 Ind. 631, 220 N.E. 2d 532 (1966) and *Smith v. Miller,* 153 Colo. 35, 384 P.2d 738 (1963).

We adhere to the maxim that the judiciary department possesses the inherent power to determine its needs and to obtain the funds necessary to fulfill such needs. The fears expressed by the intervenor to the effect that the judiciary, under the view enunciated herein, could request and demand receipt of funds in an unreasonable amount are baseless. Section 51 provides that the Governor may veto the bill and that he can do. In that event all spending units would be treated alike and the objection of discrimination would be nonexistent.

In summary of this point, we conclude that the Governor does not possess the constitutional authority to disapprove or reduce items or parts of items contained in the Budget Bill enacted by the Legislature which relate to the judiciary department. Consequently, the action taken by the Governor, in relation to the budget of the judiciary department, is declared invalid.

We come now to a consideration of the third issue— does the Governor have constitutional authority to reduce items in the Budget Bill relating to constitutional officers in a manner and to such an extent as would render their offices and functions absolutely inoperative? Giving rise to this issue was the Governor's action in relation to Account No. 160 relating to the office of State Treasurer and Account No. 250, the budget for the office of Secretary of State. The bill enacted and passed to the Governor for approval included in Account No. 160 the sum of $296,485.00 which provided for, in addition to the salary of the Treasurer, funds for other personal services, current expenses, equipment and board of investments. Account No. 250, as enacted by the Legislature, was in the sum of $197,255.00 which included, in addition to the salary of the Secretary of State, operating

funds for other personal services, current expenses and equipment.

Acting on each of these accounts, the Governor reduced the funds provided therein to zero, except that in Account No. 160 he left remaining the sum of $22,500.00, the salary of the State Treasurer, and in Account No. 250 the sum of $22,500.00, the salary of the Secretary of State. He gave as his reason for such reductions the inequality in the amounts of the appropriations for the various constitutional offices. In so doing, he acknowledged that he could not eliminate the salaries of these constitutional officers.

It is the contention of the intervenor that under the provisions of Article VI, Section 51 (11) of the Constitution the Governor may disapprove the total operating budget of any account within the executive branch of government; that this is what he did in relation to Account Nos. 160 and 250; and that such act is, therefore, legal and cannot be controlled by the courts. We agree that under Section 51 the Governor, for the reasons noted, has the authority to disapprove and reduce any account in the executive branch. He thereby definitely has the authority to equalize the accounts as he believes proper. If he believes that an appropriation for a spending unit in the executive department is higher than is warranted by the duties of the office, he certainly has the power under the Modern Budget Amendment to reduce the amount of such appropriation. We do not agree, however, that the language of Section 51, permitting him to disapprove and reduce, gives him the power to eliminate the function of the constitutional offices of the Treasurer and Secretary of State. In argument, the intervenor asserted that the Governor was "merely using the power vested in him by the people to force appropriations for these offices in line with the executive budget." It does not comport with logic or reason to reduce the appropriations for the operation of two constitutional offices to zero and say that the Governor's objective was

to bring these appropriations in line with the executive budget. Certainly the executive budget, as originally formulated and presented to the Legislature, did not contemplate the elimination of these constitutional offices. This is clearly reflected by the budget submitted by the Governor for consideration by the Legislature.

Article VII, Section 1 of our Constitution reads as follows:

> "1. The executive department shall consist of a governor, secretary of state, auditor, treasurer, commissioner of agriculture and attorney general, who shall be, ex officio, reporter of the court of appeals. Their terms of office shall be four years and shall commence on the first Monday after the second Wednesday of January next after their election. They shall reside at the seat of government during their terms of office, keep there the public records, books and papers pertaining to their respective offices and shall perform such duties as may be prescribed by law."

Thus, while the Secretary of State and Treasurer are included in the executive department of government they are none the less constitutional officers created by the people when they adopted that basic law. Clearly, the framers of the Constitution and the people intended that these officers function as a viable part of the governmental process. How then can it be reasoned that the Governor, also no more than a constitutional officer, can eliminate and prohibit the function of these offices? To permit such construction of the Governor's powers would admit a tyrannical power and lend an absurd interpretation foreign to our concept of government.

We are fully aware of the plain language of Section 51, relied upon by the intervenor, and, as heretofore noted in this opinion, are cognizant of the general rule that plain and unambiguous language is to be applied and not construed.

If the intention is manifest from the language used and leads to no absurd conclusion courts must give such

provisions the effect clearly intended. *State ex rel. Zickefoose v. West*, 145 W.Va. 498, 116 S.E.2d 398; *Appalachian Power Co. v. County Court of Mercer County*, 146 W.Va. 118, 118 S.E.2d 531; *State ex rel. Smith v. Gore*, 150 W.Va. 71, 143 S.E.2d 791. Conversely, if the language used, applied literally and to the extent asserted, leads to an absurd conclusion the court will construe it and apply the manifest intention of the enactors. As succinctly stated in *The Baird-Gatzmer Corporation v. Henry Clay Coal Mining Co.*, 131 W.Va. 793, 50 S.E.2d 673, "* * * but, we do not change plain and simple language employed in framing a statute *unless there is an impelling reason for so doing*." (Emphasis supplied.) We believe that such impelling reason exists here.

In the instant case we are of the firm opinion that it was the intent of the people that the Governor be endowed with the privilege and responsibility of formulating the budget under which our state operates, that he be afforded the right to regulate, by approving or reducing, the expenses incurred to operate the executive branch of state government but that no where was he promoted to the position of omnipotence in which exalted stance he could exercise the privilege of eliminating constitutionally constituted offices of the executive branch and rule supreme. The people have willed that the executive branch shall consist of the Governor and other constitutional offices. On many occasions it has been suggested to the people that the election of Secretary of State, Auditor, Treasurer, Commissioner of Agriculture and Attorney General be eliminated and that the appointment to such offices be left to the discretion of the Governor. As of this date such concept has not been approved by the electorate and the Governor cannot achieve that end without such approval.

The intervenor's assertion that the Governor, as a practical matter, would never abolish a constitutional office loses its effect and becomes a *non sequitur*, inasmuch as this is exactly what he did in the instant

case. There can be no merit to the averment that because the salaries of the Treasurer and Secretary of State were allowed to remain in the budget act, such offices were not abolished. It would defy reality and reason to say that either of those officers could conduct the business of such offices, as intended by the people, without any funds with which to operate and personnel to assist them. The Governor's act in reducing such accounts to zero has effectively abolished the function of such offices.

There is a respectable line of authority which holds that the discretion vested in the chief executive by the Constitution respecting his official duties is not subject to control or review by the courts. While we agree with the above principle, it must be noted in addition thereto that executive actions of a Governor are not subject to judicial interference so long as such actions fall within the sphere of his lawful authority. However, when a Governor clearly abuses his discretion or when he refuses to perform a purely ministerial duty, the above principle becomes inoperative and it becomes the duty of the courts to define the safeguards against the abuse of power as provided in our Constitution.

The court in *Ellingham v. Dye,* 178 Ind. 336, 99 N.E. 1 (1912), *error dismissed,* 231 U.S. 250, 58 L. Ed. 206, 34 S. Ct. 92, quoting language from *McConaughy v. Secretary of State,* 106 Minn. 392, 119 N.W. 408, said, in relation to the role of the courts concerning the acts of a Governor:

> "The Governor may exercise the powers delegated to him, free from judicial control, so long as he observes the laws and acts within the limits of the power conferred. His discretionary acts cannot be controllable, not primarily because they are of a political nature, but because the Constitution and laws have placed the particular matter under his control. But every officer under a constitutional government must act according to law and subject to its restrictions, and every departure therefrom or disregard thereof must subject him to the restraining and controlling power of the people, acting through the agency of

> the judiciary; for it must be remembered that the people act through the courts, as well as through the executive or the Legislature. One department is just as representative as the other, and the judiciary is the department which is charged with the special duty of determining the limitations which the law places upon all official action. The recognition of this principle, unknown except in Great Britian and America, is necessary, to 'the end that the government may be one of laws and not of men'—words which Webster said were the greatest contained in any written constitutional document."

It is our view that the Governor's act of effectively abolishing the aforesaid constitutional offices is an act in excess of his constitutionally granted powers and that the judicial branch is called upon by the people to insure the strict observance of their declared mandate.

By reason of the foregoing the Governor's action in reducing Account Numbers 160 and 250 to zero, except for the salaries of the respective officers, is declared void and the amounts enacted by the Legislature for such accounts will be restored.

A further issue to be resolved in this proceeding is whether the Governor has the authority under our Constitution to alter budgetary accounts upon receipt of the Budget Bill, after passage by the Legislature, by striking parts of items therein and in lieu thereof inserting a lump- sum figure equal to the sum of the parts of items stricken. After the Budget Bill is passed by the Legislature and is presented to the Governor, that chief executive officer, under the provisions of Article VI, Section 51(11) of the West Virginia Constitution, is specifically authorized to "disapprove or reduce items or parts of items contained therein". This is precisely what the Governor did in relation to the accounts in question and his actions in respect thereto are valid.

It may be well to illustrate the propriety of the Governor's action by following the course of one account

in this category through the law making process. For example, when the Governor submitted his budget to the Legislature it contained Account No. 190—State Commissioner of Public Institutions. He therein listed and designated the salary of the commissioner, the salaries of the members of the board of probation and parole but the salaries for all other employees were lumped into one figure as an item of that account, such item being termed "Other Personal Services". In enacting the Budget Bill, the Legislature listed under the category of "Other Personal Services" specific positions and designated a salary for each one. The Governor then took the account complained of here, struck the designated salaries of the various employees under the category of "Other Personal Services" and inserted the lump sum as aforesaid for such item.

Article VI, Section 51 (5) of our Constitution permits the Legislature to "amend the bill by increasing or decreasing any item therein", so if it had increased or decreased the amount of an item such as "Other Personal Services" its action would be in line with that allowed. However, when the Legislature undertook to expand on the Governor's budget by specifying positions under the item "Other Personal Services" and designated salaries therefor, it began to usurp the executive power reserved by the Constitution for that branch of government. The Constitution clearly contemplates an executive budget. Article VI, Section 51, West Virginia Constitution.

Wherein the Modern Budget Amendment provides that "The governor shall deliver to the presiding officer of each house the budget and a bill for all the proposed appropriations of the budget clearly itemized and classified, in such form and detail as the governor shall determine or as may be prescribed by law", the relator asserts that the phrase "as may be prescribed by law" requires, in accordance with Code, 1931, 5A-2-11, as amended, that Personal Services shall be classified and that actual expenditure for each line item under this

classification shall be designated. The Code provision referred to by the relator is contained in the article relating to the budget division of the Department of Finance and Administration and clearly relates to the tentative budget submitted by that department to the Governor. From this tentative document the Governor then prepares the executive budget "in such form and detail as the governor shall determine or as may be prescribed by law". We are aware of no provision in the law that prescribes the form and detail which must be followed by the Governor in submitting his budget to the Legislature. Reason dictates that the budget must be in sufficient form and detail to inform the Legislature whether the proposed expenditures are adequate for their purpose or in excess of that needed. With such information the Legislature can then exercise its judgment as to whether the executive figures should be increased, decreased or approved as submitted. Thus the Legislature is afforded the prerogative contemplated by the Constitution.

Let us now consider the acknowledged prerogative of the Governor to "disapprove or reduce items or parts of items" contained in the Budget Act and determine whether the Governor exceeded his powers as contended by the relator. The term "item" wherein it relates to the budget embraces a subject or purpose and an amount. *Green v. Rawls,* (Fla. 1960) 122 So. 2d 10; *State ex rel. Brown v. Ferguson,* 32 Ohio St. 2d 245, 291 N.E.2d 434 (1972); *State ex rel. Turner v. Iowa State Highway Commission,* (Iowa 1971) 186 N.W.2d 141; *People v. Tremaine,* 281 N.Y. 1, 21 N.E.2d 891 (1939); and *Reardon v. Riley,* 10 Cal. 2d 531, 76 P.2d 101 (1938). With regard to Account No. 190, as submitted by the Governor, for example, the subject was "Other Personal Services" and the amount was $543,799.00. The Legislature amended the bill by expanding the subject to include specific positions and designating specific salaries. When the Governor received the bill, as enacted by the Legislature, he disapproved the parts of the item of "Personal

Services" relating to the specific offices and restored a total figure for that item. The Governor's act in disapproving parts of items is expressly authorized under the aforesaid Section 51(11). Were this action not permitted by the Governor the Legislature could restrict the executive branch in the operation of its various functions thereby exercising an executive prerogative in direct conflict with the precept of our Constitution which prohibits one branch of government from encroaching upon or performing the duties of another. Were the Governor not permitted to disapprove of parts of items, as reflected by the instant case, the money appropriated by the Legislature could be used for no other purpose and as aforesaid the executive function could be materially impeded. Were the Governor not permitted the prerogative of acting as he did a further result could be what would amount to a legislative budget rather than an executive budget, the latter being clearly contemplated by the Modern Budget Amendment. It is the view of this Court and we so hold that the action of the Governor in relation to this category of accounts is valid and his action shall be reflected in the publication of the true Budget Act.

The respondent, C. A. Blankenship, Clerk of the House of Delegates, brings in to question the Governor's act of reducing to zero the funds provided by the Legislature in Account No. 295—State Department of Education—State Aid to Schools. In his letter to the Secretary of State the Governor gave as his reason for eliminating all of the dollars in this account "that the Legislature failed to provide the substantive legislation which is necessary for this account to be operative". The respondent asserts that this action is violative of the Constitution and therefore invalid.

The intervenor contends that this matter cannot be considered by this Court for the reason that it was not contained as an item in the petition. Inasmuch as the entire budget is before this Court and the Governor's

action in relation thereto is brought in to question, it is our view that the budgetary account relating to the public schools of our state must necessarily be considered, otherwise the adjudication of the propriety of the Governor's action concerning the Budget Act would be incomplete. The intervenor's contention therefore is without merit and this matter will be considered by the Court.

Article XII, Section 1 of the Constitution of West Virginia provides: "The legislature shall provide, by general law, for a thorough and efficient system of free schools". It has been held that this section requiring the establishment and maintenance of free schools is an absolute and mandatory duty on the part of the Legislature. *State ex rel. Trent v. Sims*, 138 W.Va. 244, 77 S.E.2d 122 (1953). Elsewhere in the Constitution is noted the requirement that the Legislature provide a free school system. Article XII, Section 5 of our Constitution requires the Legislature in a mandatory manner to provide financial support for free schools. See *Kuhn v. Board of Education*, 4 W.Va. 499 (1871). It is the view of this Court that the foregoing adequately reflects the will of the people, through the basic law enacted by them, that a thorough and efficient system of free schools is of paramount importance in a free society and that neither the Legislature nor the executive branch of government may perform any act which would result in the elimination of this safeguard.

For the reasons heretofore stated in this opinion in the discussion invalidating the Governor's act of reducing to zero, except for the salaries, Account Nos. 160 and 250, we are of the opinion and hold that the course taken by the Governor in reducing to zero the amount provided for State Aid to Schools in Account No. 295 is an unconstitutional act and is invalid. The amount of $166,866,052.00 shall therefore be reinstated in the budget. In relation to other line items in Account No. 295, Minimum Salaries for Service Personnel and 5%

Salary Increase for Professional Personnel, said items not being of a constitutional nature, will be eliminated from Account No. 295 in accordance with the Governor's action.

For the reasons stated in this opinion, the Budget Act will be published as reflected by the order heretofore filed in accordance with the directions therein as follows:

(1) Wherein the Governor has not disapproved or reduced the Budget Act it shall be published as enacted by the Legislature;

(2) The following accounts shall be published as passed by the Legislature: Nos. 110, 111, 114, 160 and 250. Account No. 295 will be published as follows:

State Aid to Schools _____ $166,866,052.00

Total _____ $166,866,052.00

(3) The following accounts shall be published as altered and approved by the Governor: Nos. 165, 190, 240, 285, 286, 297, 298, 370, 371, 372, 373, 374, 375, 376, 380, 384, 401, 410, 418, 419, 420, 421, 422, 423, 424, 425, 426, 430, 431, 432, 510, 565, 614, 835, 873 and Item VII, National Bicentennial;

(4) Wherein the Governor disapproved items or parts of items in an account, but failed to present reasons therefor, the account shall be published as passed by the Legislature.

The writ of mandamus praying that the respondent be compelled to publish the true Budget Act is awarded as directed in this opinion.

*Writ awarded.*

NEELY, JUSTICE, dissenting:

I respectfully dissent from the majority's holding that Article VI, Section 51 of the *Constitution of the State of West Virginia* permits the Governor to strike specific purposes or conditions attached to items of appropriation

and insert a lump sum figure equal to the original amount appropriated.

The language of Subsection 11 of Article VI, Section 51 of the *Constitution* is ambiguous and requires interpretation consistent with the intent of both the drafters and the electorate. The provision that " . . . The governor may veto the bill, or he may disapprove or reduce items or parts of items contained therein. . . ." was not intended to eliminate the Legislature's absolute power over the appropriation of funds. Three hundred years of British and American constitutional history accord the Legislature the preeminent weapon of the purse to insure conformity to its will by other branches of government. Under the rule enunciated by a majority of this Court, a governor is now permitted unbridled discretion in the use of money appropriated within line item categories. Legislative attempts to establish priorities through the imposition of conditions on expenditures will henceforth be unavailing.

The diversity of state constitutions forecloses the possibility of a universal precedent on this subject. Where this issue has been fairly raised concerning constitutions similar to ours the better reasoned interpretation has been that where there is an executive budget with partial vetoes, an appropriation along with all conditions should be considered one item. Under this interpretation a governor may completely veto or partially reduce an item, but he may not change the conditions attached to the expenditure of any money. This interpretation finds precedent in the case of *In Re Opinion of The Justice,* 294 Mass. 616, 2 N.E.2d 789 (1936) in which the court said:

> " . . . By section 5 of said article 63, 'the governor may disapprove or reduce items or parts of items in any bill appropriating money. So much of such bill as he approves shall upon his signing the same become law. As to each item disapproved or reduced, he shall transmit to the house in which the bill originated his reason for such disapproval

or reduction, and the procedure shall then be the same as in the case of a bill disapproved as a whole.' The fact that this section relates solely to appropriation bills, in conjunction with the word 'reduce,' indicates clearly that the expression 'items or parts of items' refers to separable fiscal units. They are appropriations of sums of money. Power is conferred upon the Governor to reduce a sum of money appropriated, or to disapprove the appropriation entirely. No power is conferred to change the terms of an appropriation except by reducing the amount thereof. Words or phrases are not 'items or parts of items.' This principle applies to the condition attached to the appropriation now in question. That condition is not an item or a part of an item. The veto power conferred upon the Governor was designed to enable him to recommend the striking out or reduction of any item or part of an item. In the present instance His Excellency the Governor did not undertake to veto the appropriation of $100,000 made by item 101, or any part of it, nor to reduce that amount or any part of it apportioned to a specific purpose. He sought, rather, as shown by his message, to enlarge the appropriation made by the General Court by throwing the $100,000 into a common fund to be used for any one of several different purposes. We are of opinion that the power conferred upon him by said article 63 does not extend to the removal of restrictions imposed upon the use of the items appropriated. It is plain that no other provision of the Constitution confers power upon the Governor to disapprove the condition attached to the item in question."

Our sister state of Virginia has similarly held under circumstances almost identical to the case at bar in the case of *Commonwealth v. Dodson*, 176 Va. 281, 11 S.E.2d 120 (1940) in which the court said:

"We think it is plain that the veto power does not carry with it power to strike out conditions or restrictions. That would be legislation. Plainly, money devoted to one purpose can not be used for another, and it is equally plain that power to impose conditions before it can become available is legislation.

> "An item in an appropriation bill is an indivisible sum of money dedicated to a stated purpose. It is something different from a provisions or condition, and where conditions are attached, they must be observed; where none are attached, none may be added."

While there are cases holding to the contrary, I believe that they reflect a theory of government which is inconsistent with our tradition of separation of powers. The history of liberty is the history of legislatures. When once the Legislature has been divested of its traditional power of the purse it will stand like Stonehenge as a useless and incomprehensible monument to a past era. *Sic transit gloria mundi.*

SPROUSE, JUSTICE, dissenting:

I concur with the opinion of the majority except those parts of the opinion relating to Account Nos. 160 (Office of the State Treasurer), 250 (Office of the Secretary of State), and 295 (State Department of Education—State Aid to Schools), and I respectfully dissent to that portion of the decision ruling on those accounts.

Article VII, Section 1 of the Constitution provides that: "The executive department shall consist of a governor, secretary of state, auditor, treasurer, commissioner of agriculture and attorney general * * * . They * * * shall perform such duties as may be prescribed by law." It is clear from the bare language of this section that each constitutional officer has equal authority in their individual sphere of government as prescribed by the legislature. Prior to the passage of the Modern Budget Amendment in 1968, the Constitution also assigned them certain powers and duties relating to the budget. Article VI, Section 51, prior to its 1968 amendment, divided executive participation in the budget making process among these constitutional officers comprising the Board of Public Works. The main function of shaping and submitting the budget was the responsibility of the Board.

Thus, the governor's power over the budget was severely limited.

After passage of the budget by the legislature, even the Board had no authority to alter it. The governor, under Article VII, Section 15, could veto the total bill or any item contained in it, but his veto could be overridden by a majority vote of each house of the legislature.

It is difficult to know with what purpose the framers of our Constitution drafted this governmental interplay. This type of process certainly provided an avenue of political and governmental checks among the departments comprising the executive branch. It became obvious over the years, however, that such a budget making scheme also resulted in inefficiency in government and political horse trading. The purpose of the Modern Budget Amendment was to create a sounder governmental approach to fiscal matters and to create stronger directive powers in the office of governor.

Under the Modern Budget Amendment, the power to shape and submit the executive budget is reposed exclusively in the governor. In its amended form, Article VI, Section 51, subsection D, paragraph 11, provides, among other things, as follows:

> " * * * The governor may veto the bill, or he may disapprove or reduce items or parts of items contained therein. * * * The bill, items or parts thereof, disapproved or reduced by the governor, shall be returned with his objections to each house of the legislature.

> "Each house shall enter the objections at large upon its journal and proceed to reconsider. If, after reconsideration, two thirds of the members elected to each house agree to pass the bill, or such items or parts thereof, as were disapproved or reduced, the bills, items or parts thereof, approved by two thirds of such members, shall become law, notwithstanding the objections of the governor. * * * "

It is true that despite some attempts from time to time to have the secretary of state, auditor, treasurer, commissioner of agriculture and attorney general constitutionally demoted to the status of appointive officers within the governor's official family of the executive branch, that such amendatory action has never been taken. They remain constitutional officers.

Their only constitutionally described functions, the budget making powers, however, have been taken from them by the amended Section 51. In addition to this, the governor has been given specific authority to alter their appropriations unless his action is overridden by a vote of two-thirds of the legislature.

Power over the purse is undoubtedly power in many instances to control administration. The voters of this State have granted the governor authority over the purse strings of the other components of the executive branch of government.

In the absence of any evidence as to legislative intent or of any special purpose or meaning of the proposed constitutional language communicated to the people, it must be assumed the voters were aware that in ratifying the new Article VI, Section 51, they were altering the functions of the constitutional members of the executive branch of the government in the manner expressed by the plain language of the proposed Section 51.

The majority of my colleagues agree that the governor has the authority to disapprove or reduce any account in the executive branch including that of the other constitutional officers. They insist, however, that the governor cannot go so far as to disapprove the entire budget of any of these departments. This is where I respectfully disagree. The majority, in their opinion, indicate that this Court must review the governor's action when he has abused his discretion in exercising veto authority over the executive budget. In my view there

are areas in which a governor's abuse of his constitutional power can be judicially reviewed, but this is not one of them.

In *Slack v. Jacob,* 8 W.Va. 612, 664, it is said:

" * * * As to all authority specially confided to the governor, whether by the constitution or by statute, it will be presumed that reasons of a conclusive nature required it to be so confided as an authority properly and peculiarly, if not exclusively, pertaining to the executive department, *and therefore not subject to coercion by judicial powers.* * * * " (Italics Supplied.)

In *Hatfield v. Graham,* 73 W.Va. 759, 81 S.E. 533, the Court held in the first point of the syllabus as follows:

"The office of governor is political and the discretion vested in the chief executive by the Constitution and laws of the State respecting his official duties is not subject to control or review by the courts. *His proclamations, warrants and orders made in the discharge of his official duties are as much due process of law as the judgment of a court."* (Italics Supplied.)

This principle of law was as recently affirmed as *State ex rel. Bache & Co., Inc. v. Gainer,* 154 W.Va. 499, 177 S.E.2d 10, in 1970.

The majority opinion quoted language from *McConaughy v. Secretary of State,* 106 Minn. 401, 119 N.W. 408, as follows:

"The Governor may exercise the powers delegated to him, free from judicial control, so long as he observes the laws and acts within the limits of the power conferred. His discretionary acts cannot be controllable, not primarily because they are of a political nature, but because the Constitution and laws have placed the particular matter under his control. * * * "

In applying this established principle of law, the majority reason that the governor's acts, in relation to his disapproval of these parts of the budget, were in "excess

of his constitutionally granted powers." His acts at most are an abuse of discretion, and as was said in *McConaughy*, "[h]is discretionary acts cannot be controllable." To apply this principle otherwise would require this Court in each instance to determine what percentage of the budget a governor can approve or disapprove. Would, for example, the governor have operated unconstitutionally if he had disapproved five percent of the budgets of the treasurer and secretary of state, or ten or fifty or seventy-five percent? The majority's answer is that if a department is left with insufficient funds to operate, the governor has abused the discretion allowed him or has acted "in excess of his constitutionally granted powers."

It is my belief that the governor has complete discretion, under the language of the amended Section 51, to veto the bill or disapprove or reduce items or parts of items contained therein. The language of paragraph 11 of subsection D of Section 51 places absolutely no limitations on the degree to which this veto may be exercised in this regard. The language is in absolute, clear, and unambiguous terms. When a constitutional provision, as well as a simple statute, is clear and unambiguous, it is to be applied and not construed. This Court reiterated this constitutional principle no later than *State ex rel. Browning v. Blankenship*, 154 W.Va. 253, 175 S.E.2d 172.

Moreover, paragraph 13 of subsection D provides in part: "In the event of any inconsistency between any of the provisions of this section and any of the other provisions of the Constitution, the provisions of this section shall prevail. * * * "

The people, by their enactment of the amended Article VI, Section 51, gave the governor authority to absolutely veto or reduce the budget of all branches or divisions of the executive government. Since the exercise of discretion in this area of executive power is not reviewable by the judiciary, the governor's actions are political

in the generic sense. Consequently, aside from legislative override of the veto, the only sanctions imposed upon the governor's abuse of his discretion are removal through the electoral process or by impeachment. Certainly if he were to act so irresponsibly as to effectively eliminate the operation of one of the branches of state government during his term of office, the people would respond by not returning him to the office at the next election. This is the people's response to political accounting. Secondly, if he grossly abused the power reposed in him by the people, he is subject to be removed from office under the provisions of Article IV, Section 9 of the Constitution. This provides in part: "Any officer of the State may be impeached for maladministration, corruption, incompetency, gross immorality, neglect of duty, or any high crime or misdemeanor."

I assume the majority would agree that the governor has the right to veto, disapprove or reduce any item of the budget of the State Department of Highways or the Department of Public Safety whether or not that completely eliminated all the money in those particular budgets. The functions of those departments are just as vital to the government of West Virginia as are the functions in the treasurer's office or in the office of the secretary of state. For that matter, a good argument could be made for the impeachment or removal of an irresponsible governor who would completely eliminate the operation of the state department of highways or the department of public safety or any other vital component of government by the arbitrary use of veto power granted in Section 51.

The fact that the secretary of state and treasurer are mentioned in Article VII, Section 1, as constitutional officers gives them no more standing to have their budgets protected from the actions of the governor than the other vital components of state government. The amended Section 51 specifically brought those constitutional officers under the governor's budget making authority.

In my view, the people of West Virginia, in ratifying the amendment of Article VI, Section 51 in 1968, clearly evinced their desire to have a truly executive budget and by the Modern Budget Amendment, the governor of West Virginia was constituted a truly strong constitutional executive officer. This power goes one step further than decided by the majority opinion and permits the governor to have control over the entire executive budget, excepting the salaries of the other constitutional executive officers.

The same reasoning applies to the governor's action in vetoing the items in Account 295, the school account.

Article XII, Section 1 of the Constitution provides: "The legislature shall provide, by general law, for a thorough and efficient system of free schools." Here again, like the provision of Article VII, Section 1, providing for the existence of the constitutional offices of secretary of state, treasurer, auditor, commissioner of agriculture and attorney general, Article XII, Section 1 has imposed upon it by Article VI, Section 51 the governor's authority to make a budgetary imput into the school system by the veto, reduction or disapproval.

While it is almost inconceivable that a governor would arbitrarily use his power to impair the operation of the free school system, it is equally inconceivable that a governor would impair the operation of the state department of highways or the department of public safety. Assuming, however, that this should come to pass, the only limitation is the limitation of the legislature overriding his budget action by a two-thirds vote of those bodies, or by impeachment under Article IV, Section 9, or by the ultimate electoral process.

I am authorized to state that Justice Haden joins in this dissenting opinion.