STATE *ex rel.* CHARLES F. BAGLEY, JR., *a duly licensed
attorney at law and citizen and taxpayer of the State of
West Virginia, and* ERNEST C. SWIGER, *a duly licensed
attorney at law and citizen and taxpayer of the State of
West Virginia, Relators*

*v.*

C. A. BLANKENSHIP, *Clerk of the House of Delegates of
West Virginia, Respondent*

(No. 14181)

Decided June 19, 1978.

*James K. Brown* for relators.

*Jack M. McCarty, Victor A. Barone, Finance Com., House of Delegates*, for respondent.

PER CURIAM:

The ship of state seems to have entered upon a sea of troubled waters. The West Virginia Legislature, whose members are sworn to support the Constitution, is accused of violating the Constitution by decreasing five items in the Judiciary's budget for fiscal year 1978-1979. The appropriation of funds for government operations and the enactment of the budget bill are clearly functions and responsibilities of the Legislature, but the Constitution, Article VI, Section 51, Subsection B(5), provides limitations on legislative action in the following language:

> The Legislature shall not amend the budget bill so as to create a deficit but may amend the bill by increasing or decreasing any item therein: *Provided*, That no item relating to the judiciary shall be decreased, and except as otherwise provided in this Constitution, the salary or compensation of any public officer shall not be increased or decreased during his term of office: *Provided further*, That the Legislature shall not increase the estimate of revenue submitted in the budget without the approval of the Governor.

The budget bill for the 1978-1979 fiscal year, as enacted by the Legislature with the five judiciary items decreased, has been recorded and published by the Clerk of the House of Delegates pursuant to provisions of West Virginia Code, Section 4-1-13, and, with some modifications not here in issue, has been approved by the Governor and forwarded to the Secretary of State for filing. Two attorneys, members of The West Virginia State Bar and citizens and taxpayers of the State, have presented

to the Court their verified petition for a writ of mandamus requiring the Clerk of the House of Delegates to record and publish a constitutionally correct and true budget bill including therein the five items of the Judiciary's budget without the appropriation decreases attempted to be effected by action of the Legislature.

The Clerk of the House of Delegates, respondent in the mandamus action, has filed a motion that Justice Darrell V. McGraw, Jr., disqualify himself as a Justice of the Court sitting in the case so presented, or, in the alternative, that the Court disqualify Justice McGraw from so sitting. The respondent has also filed his verified answer to the petition for a writ of mandamus, setting forth therein eleven separate defenses and praying that the petition be dismissed. Later he filed a motion to take depositions to which relators replied in opposition.

When the petition for a writ of mandamus was initially presented to the Court, and before any action was had thereon, four Justices of the Court, including the Chief Justice, disqualified themselves. Justice McGraw, on preliminary examination of the issues involved and finding and knowing of no good and valid reasons for his disqualification, declined to disqualify himself. He was thereupon designated to act as Chief Justice of the Court to be composed of himself and four retired judges of the state eligible to be recalled for judicial duties under provisions of Article VIII, Section 8, of the Constitution. The jurists recalled for duty, Judge Oliver D. Kessel, a former Justice of the Court and former Circuit Court Judge, and Judge Charles A. Duffield, Jr., Judge Charles L. Garvin, Jr., and Judge F. Morton Wagner, all former Circuit Court Judges from different areas of the state, took the prescribed oath and were seated to hear and determine the matters in issue in the mandamus proceedings to be presented. The Court so composed convened on April 28, 1978, for formal presentation of the petition for the writ of mandamus by petitioners' attorney and at that time heard oral responses by attorneys for the named respondent then present in Court. A rule was issued requiring the respondent, C. A. Blankenship,

Clerk of the House of Delegates of the West Virginia Legislature, to show cause why a peremptory writ of madamus should not be awarded against him as prayed in relators' petition. The rule was made returnable in Court on June 1, 1978, and a calendar for prompt and orderly development of the proceedings through motions, answer and briefs was established.

The factual picture projected in the controversy presents a classic example of the three basic branches of the state government in operation. Article V of the Constitution provides:

> The Legislative, Executive and Judicial Departments shall be separate and distinct, so that neither shall exercise the powers properly belonging to either of the others ..."

The Judicial Department was substantially transformed by the Judicial Reorganization Amendment to the Constitution adopted by vote of the people in 1974. The purpose of the amendment so adopted was "To amend the State Constitution to provide a unified court system which assures to prompt and efficient administration of justice in West Virginia." Section 15 of Article VIII of the amendment provides:

> The provisions of this article shall supercede and prevail over all other provisions of this Constitution which are expressly or impliedly in conflict or inconsistent therewith.

Section 3 of that article provides in part that:

> ... The administrative director shall, under the direction of the chief justice, prepare and submit a budget for the court.

The Court's administrative director prepared the Judiciary's 1978-1979 budget and, by letter of November 17, 1977, submitted four copies of the budget request to the State Auditor consistent with provisions of Article VI, section 51, Subsection B(3)(c), of the Constitution. The transmittal letter requested that the Auditor "forward these documents to the Budget Division of Finance and

Administration where they can be placed in the West Virginia Budget Documents."[1] Respondent's Exhibit No. 8 indicates the budget documents were received and processed by the Department of Finance and Administration wherein some word changes were made later prompting inquiries by a member of the Senate Finance Committee to the Court's administrative director concerning the meaning and intent thereof. By separate letters of December 5, 1977, the Court's Chief Justice advised the President of the Senate, the Speaker of the House of Delegates, the Chairman of the Senate Finance Committee and the Chairman of the Finance Committee of the House of Delegates that the Judiciary budget request so submitted embraced proposed salary increases for Justices of the Supreme Court and Judges of the Circuit Courts of the state, that the salary increases were matters within the judgment and discretion of the Legislature, and that, if the salaries were not increased by enacted statutes, the Judiciary's budget request would be revised to reflect the actual salaries as established by law. By letter of January 11, 1978, the Governor transmitted to the Legislature the State's budget and budget bill for the fiscal year beginning July 1, 1978. The budget bill, as so submitted by the Governor, included, at pages 11 and 12, the Judiciary's budget request in words and figures as follows:

JUDICIAL
4—Supreme Court—General Judicial
Acct. no. 111

1. Personal Services ........................$10,478,454
2. Other Expenses ...........................1,562,600
3. Judges' Retirement System ..................750,000
4. Other Court Costs.........................1,770,000

---

[1] West Virginia Code, § 5A-2-1, provides:

The budget division shall act as staff agency for the governor in the exercise of his powers and duties under section 51, article VI of the state Constitution, and shall exercise and perform the other powers and duties conferred upon it by this article. See also W.Va. Code, § 5A-2-2.

5. Judicial Training Program ................... 100,000
6. Law Libraries Program ...................... 250,000
   Total ........................... $14,911,054

The budget bill was introduced in the Senate on January 11, 1978, and became Senate Bill No. 50, and was introduced in the House of Delegates on the same date and became House Bill No. 701. The Senate Bill was referred to the Senate Finance Committee, and the House Bill was referred to the House Finance Committee for consideration and report. The Senate Finance Committee reported its Committee Substitute for Senate Bill No. 50, the budget bill, to the Senate floor where it was placed on the Special Calendar for Wednesday, March 1, 1978. The Journal for the House of Delegates for March 2, 1978, shows a message from the Senate on the Senate's passage of its Committee Substitute for Senate Bill No. 50. On motion in the House of Delegates the Senate's Committee Substitute for Senate Bill No. 50, the budget bill, was not referred to a House committee, but was taken up for immediate consideration, read a first time, and ordered to second reading. The House Journal for March 3, 1978, shows the House Committee Substitute and the Senate Committee Substitute for the budget bill were advanced to third reading with the right to further amend. The House Journal for March 4, 1978, shows the House of Delegates on motion struck out all of Committee Substitute for Senate Bill No. 50 following the enacting clause and inserted in lieu thereof the language of Committee Substitute for House Bill No. 701. The House then passed the Committee Substitute for Senate Bill No. 50, as amended, by a 73 to 7 vote and later made the bill effective from passage. On further motion in the House, Engrossed Committee Substitute for House Bill No. 701 was tabled. Senate Committee Substitute for Senate Bill No. 50, as amended in the House of Delegates, was referred to a Joint Conference Committee of the two houses of the Legislature for reconciliation and was reported back to the Senate and House of Delegates on Monday, March 13, 1978, in an

extended session of the Legislature. On that date the budget bill was passed, was made effective from passage, and was forwarded to the Governor on March 17, 1978. The Judicial Budget, included in the budget bill as passed by the Legislature and approved by the Governor, is in the following words and figures:

## JUDICIAL
### 4—Supreme Court—General Judicial
### Acct. No. 111

| | |
|---|---:|
| 1. Personal Services | $9,177,634 |
| 2. Other Expenses | 962,400 |
| 3. Judges' Retirement System | 750,000 |
| 4. Other Court Costs | 1,684,000 |
| 5. Judicial Training Program | 50,000 |
| 6. Law Libraries Program | 117,000 |
| Total | $12,741,034 |

Line item 1 for personal services in the Judiciary's budget as reported in Senate Committee Substitute for Senate Bill No. 50, originating in the Senate Finance Committee, shows a figure of $8,577,634 and a total Judiciary budget figure of $12,141,034. The compromise budget bill as enacted by the Legislature and approved by the Governor has a $9,177,634 figure in line item 1 for personal services for the Judiciary and a total budget figure of $12,741,034 for the Judiciary. Otherwise the Judiciary budget figures, Account No. 111, in the 1978-1979 budget bill as enacted by the Legislature and approved by the Governor are identical with the figures in Committee Substitute for Senate Bill No. 50 originating in the Senate Finance Committee. We need not in this case at this time further open the door to view the individual and personal responsibility for the decreases effected in the Judiciary's budget. The action became the action of the Legislature. A reminder of the trust placed by the people in their elected representatives and the legislator's oath to support the Constitution will have some ameliorating effects.

In the early years of our democracy the people learned that the legislative branch of the government had strength and power in its control of revenues and appropriations. Hamilton noted this in The Federalist No. 78 when he wrote:

> ... The Executive not only dispenses the honors, but holds the sword of the community. The Legislature not only commands the purse, but prescribes the rules by which the duties and rights of every citizen are to be regulated. The Judiciary, on the contrary, has no influence over either the sword or the purse ...

The Judicial Amendment to the Constitution, adopted by the voters on November 4, 1902, entrusted to the Legislature the power and authority to fix the salaries of judges of the state. Senate Joint Resolution No. 1, adopted by the Legislature on May 21, 1917, proposed to add "The Budget Amendment" as Section 51 to Article VI of the Constitution. The amendment, ratified by vote of the people at the general election on November 5, 1918, provided:

> The Legislature shall not amend the budget bill so as to create a deficit but may amend the bill by increasing or diminishing the items therein relating to the Legislature, and by increasing the items therein relating to the judiciary....

This language remained in the Constitution for half a century. The Legislature proposed an amendment to the Constitution by Senate Joint Resolution No. 3, adopted on March 10, 1939, whereby its power and authority to reduce items in the Judiciary's budget would be prohibited. Again the Legislature, by House Joint Resolution No. 3, Acts of 1967, proposed the Modern Budget Amendment, and by Chapter 15, Acts of 1968, submitted the amendment to the voters. The voters ratified the amendment by a large majority at the general election on November 5, 1968, thereby writing into the Constitution the provision at center stage in this controversy— "that no item relating to the judiciary shall be decreased" by the Legislature. By Committee Substitute

for Senate Joint Resolution No. 6, adopted March 9, 1974, the Legislature proposed the Judicial Reorganization Amendment to the Constitution. The amendment was adopted by the voters at the general election on November 5, 1974. It provides in part in Article VIII, Section 7:

> Justices, judges and magistrates shall receive the salaries fixed by law, which shall be paid entirely out of the state treasury, and which may be increased but shall not be diminished during their term of office, and they shall receive expenses as provided by law....

This language and the language in the 1902 Judicial Amendment removed judges' salaries from the general constitutional inhibition against increasing and decreasing salaries during an officer's term.

At the 1978 Regular Session of the Legislature, Senate Joint Resolution No. 6, proposing to amend the budget provisions of the Constitution, was introduced and was referred to the Committee on the Judiciary. The Resolution proposed that the budget provisions of the Constitution be amended to give the "Legislature the power to decrease budget items relating to the judiciary." The power sought in this proposed amendment is the power the Legislature attempted to exercise in its decrease of five line items in the Judiciary's budget enacted as a part of the state's budget for fiscal year 1978-1979. The 1978 Resolution died in the Senate Committee on the Judiciary without action reported thereon.

This brief summary of legislative and constitutional history points to the conclusion that over the years the Legislature in proposing and the people in adopting budget provisions in the Constitution accepted and approved the plain and clear inhibitory language "that no item relating to the judiciary shall be decreased" by the Legislature. This language indicates a departure from the early established position that the legislative branch of the government totally "commands the purse" and reflects a desire to assure adequate financing for the

Judiciary which is greatly limited, by the Judicial Code of Ethics and otherwise, from participation in political campaigns and other political party activities. Across the country the need and desire to assure and protect adequate judiciary financing are manifest. *See* 1974 Ariz. St. L. J. 639.

The basic and controlling issue for decision is whether the Legislature, in its enactment of Committee Substitute for Senate Bill No. 50, the budget bill embracing all state appropriations for fiscal year 1978-1979, unconstitutionally decreased line items 1, 2, 4, 5, and 6 in the Judiciary's budget contained therein. As above quoted, Article VI, Section 51, Subsection B(5), of the West Virginia Constitution provides that "no item relating to the judiciary shall be decreased." The Judiciary's budget, as prepared by the Judicial Department and processed through the State Auditor and Department of Finance and Administration, was included in the state's executive budget and transmitted to the Legislature by the Governor with the following line item appropriation requests under Account No. 111:

1. Personal Services ......................... $10,478,454
2. Other Expenses ............................. 1,562,600
3. Judges' Retirement System .................. 750,000
4. Other Court Costs .......................... 1,770,000
5. Judicial Training Program .................. 100,000
6. Law Libraries Program ...................... 250,000

The Judiciary's budget Account No. 111 in the Budget Bill as enacted by the Legislature includes the following line item appropriations for the Judicial Department:

1. Personal Services........................... $9,177,634
2. Other Expenses ............................. 962,400
3. Judges' Retirement System .................. 750,000
4. Other Court Costs .......................... 1,684,000
5. Judicial Training Program .................. 50,000
6. Law Libraries Program ...................... 117,000

It is apparent that line item 1 was decreased by $1,300,820, line item 2 was decreased by $600,200, line

item 4 was decreased by $86,000, line item 5 was decreased by $50,000, and line item 6 was decreased by $133,000.

The factual situation so developed must be viewed, examined and tested in the light of respondent's motion to disqualify a member of the Court, his motion to set a schedule for taking depositions, and the eleven defenses asserted in his verified answer to relators' petition.

## Motion on Disqualification

Respondent moved "that Justice Darrell V. McGraw, Jr., disqualify himself from further participation in this case. In the alternative, respondent moves that the permanent members of this Court, or the special panel, whichever the Court deems proper, disqualify Justice McGraw pursuant to the Court's authority under Article VIII, Section 8 of the West Virginia Constitution." Respondent cites bias, prejudice, partiality, and due process violations as reasons for disqualifying Justice McGraw. Upon review and consideration of the record as presented, including particularly respondent's motion, supported by his affidavit and exhibits, together with the memorandum of law in support thereof, Justice McGraw affirmed that he knew of no good and valid reasons why he was disqualified to hear and decide the issues in this controversy in a fair, just and impartial manner, consistent with his commission, responsibility and oath of office as an elected member of the Court. Accordingly, he has declined to disqualify himself. Thereupon the Court entered its order of May 17, 1978, directing the motion to disqualify Justice McGraw "in the first instance to the permanent members of the Court for their ruling thereon," consistent with the language of the motion. The designated Court deferred any action on or disposition of the motion, awaiting a ruling thereon by the permanent members of the Court. By order of May 19, 1978, the permanent members of the Court, "Justices Harshbarger and McGraw abstaining, being of the opinion that they have recused themselves for all purposes, redirect said motion to the designated

Court for consideration in the light of *State ex rel. Matko v. Ziegler, Judge,* 154 W. Va. 872, 179 S.E.2d 735." In the *Matko* case, decided in 1971, the Court denied a motion to disqualify Judge Chauncey H. Browning, holding that:

> ... A majority of this Court, Judge Browning not participating, denies that motion for the reason that the question whether Judge Browning should participate in the consideration and decision of this proceeding should be decided by him and not by this Court ...

The designated Court, with Justice McGraw abstaining, entered its order of May 24, 1978, denying respondent's motion to disqualify Justice McGraw "for reasons to be stated in the written opinion hereinafter to be filed if one is deemed necessary."

Counsel for respondent, in their memorandum of law, cite two developments which they contend would require a ruling on the disqualification issue different from the position noted in *State ex rel. Brotherton v. Blankenship,* ____ W. Va. ____, 207 S.E.2d 421 (1973). They contend that *Louk v. Haynes,* ____ W. Va. ____, 223 S.E.2d 780 (1976), requires Justice McGraw to disqualify himself. The decision in that case recognizes that disqualifying interests cannot be defined with precision and that circumstances and relationships must be considered. Further, counsel, quoting from the decision, reasons that "a judge should recuse himself" if he cannot "hold the balance nice, clear and true between the State and the accused" in a criminal case. In the context of the case now before the Court, we have no reason to disagree with the *Louk* decision. We adhere to and apply the principles enunciated in Canon 3 of the Judicial Code of Ethics governing the West Virginia judiciary, in the *Matko* case ruling on the disqualification issue, and in syllabus, point 3, in *State ex rel. Monongahela Valley Traction Co. v. Beard,* 84 W. Va. 312, 99 S.E. 452 (1919), which holds:

> At the common law, as now administered in England and in the United States, bias or favor,

> not the result of interest or relationship, is not supposed to exist, and in the absence of legislative prohibiton, when the judge in a particular case is not called upon to pass on the facts, he is not thereby disqualified to preside at a trial, but he may properly, of his own will, retire from a case under such circumstances.

Justice McGraw, in his own judgment and discretion, has declined to recuse himself. With Justice McGraw abstaining, we have carefully reviewed and considered the record and the law relevant thereto, and find no power or authority lodged in this Court on which to disqualify him from participation in hearing this cause and in the determination of the issues involved. Counsel for respondent contend that another development since the *Brotherton* decision in 1973, the adoption of the Judicial Reorganization Amendment to the Constitution in 1974, gives to the Court, in the language of Article VIII, Section 8, of the Amendment, the power and authority "to disqualify a justice from acting in a particular case." The language of that Amendment authorizes the Court to censure, suspend and retire justices and judges in accordance with procedures and requirements therein detailed, but does not authorize and empower the Court to disqualify summarily a justice from participation in a particular case as contended by counsel for respondent. The Court is empowered to construe, interpret and apply provisions of the Constitution, but may not add to, distort or ignore the plain mandates thereof.

The administration of justice requires a clear definition and a just and prompt resolution of issues in litigation. As above noted, the basic issue for decision herein is whether the Legislature decreased five line items in the Judiciary's 1978-1979 budget in violation of the West Virginia Constitution. Despite the statements attributed to Justice McGraw in respondent's motion and affidavit, including newspaper exhibits reporting criticism of legislative leadership and action, decision of the basic constitutional issue now before the Court clearly depends on the language and meaning of the Constitution and

whether the action of the Legislature is in violation thereof. The controlling issue, thus defined and refined, can readily be decided on bases of well-established principles of constitutional law. Contamination of the balances through personal feelings, bias, prejudice or partiality is foreign to the decisional process in such cases. The charges asserted as bases for disqualification of Justice McGraw are, in the context of this case, inappropriate, extraneous and not well-taken.

Many years ago the American Bar Association, in Canon 3 of the Canons of Judicial Ethics, admonished:

> It is the duty of all judges in the United States to support the federal Constitution and that of the state whose laws they administer; in so doing, they should fearlessly observe and apply fundamental limitations and guarantees.

Canon 3 of the Judicial Code of Ethics, as above referenced, asserts:

> A judge should be faithful to the law and maintain professional competence in it. He should be unswerved by partisan interests, public clamor, or fear of criticism.

The Canon "does not prohibit judges from making public statements in the course of their official duties or from explaining for public information the procedures of the court." Further, the Canon admonishes that:

> A judge should diligently discharge his administrative responsibilities, maintain professional competence in judicial administration, and facilitate the performance of the administrative responsibilities of other judges and court officials.

The Judicial Reorganization Amendment, Article VIII, Section 3, of the Constitution, placed heavy responsibilities on this Court for administration of the state's entire court system. The mandate of the people, so expressed, commands the members of the Court to be alert to the needs and requirements of the court system

throughout the state. Acts of omission and commission adversely affecting the administration of justice need to be detected and corrected and may at times require a justice or judge to "diligently discharge his administrative responsibilities" consistent with the admonition in Canon 3 of the Judicial Code of Ethics.

Justices and judges are not obliged to separate and isolate themselves from the people they serve and remain silent when needs and crises arise incident to the judiciary and the administration of justice. Article III, Section 2, of the Constitution provides:

> All power is vested in, and consequently derived from, the people. Magistrates are their trustees and servants, and at all times amenable to them.

The justices and judges must firmly and forthrightly hear and decide issues involving the sensitive areas of life, liberty and property and to do so must maintain the human touch and sustain the right of the people to know. Ecclesiastes 3:7 instructs us that there is "a time to keep silence, and a time to speak." Some are more vocal than others. When a plain provision of the Constitution, proposed by a previous Legislature and adopted by the voters of the state, is violated by action of the Legislature despite a sworn obligation to support the Constitution, some of the more vocal people, including justices, judges, patriots or students of government, may feel compelled to raise their voices in protest. Few among us today would want to still the voice of a Patrick Henry or to dry up the pen of a Harriet Beecher Stowe. All persons within the jurisdiction and reach of the state's courts have interests in this litigation. The two attorney petitioners are recognized to have substantial interests to justify their standing to commence and prosecute the action. The justices, judges and magistrates are interested in the adequate and orderly administration of justice through the judicial system. It may be properly noted at this point that the salaries of justices and judges and the retirement income of retired

justices and judges are not at issue in this litigation. The salaries of justices and judges are fixed by statute, apart from the budget bill, and remain unchanged. Line item 3 of the Judiciary's budget request for Judges' Retirement System is the one line item not reduced or modified in the legislative process of enacting the 1978-1979 fiscal year budget bill. Judicial salaries are not involved, fixed or determined in this case. The monetary interests in the due process of law violations asserted by respondent are nonexistent in this litigation, making inapplicable the decisions in *Tumey v. Ohio*, 273 U.S. 510, 47 S. Ct. 437, 71 L. Ed. 749 (1927), and *Williams v. Brannen*, 116 W. Va. 1, 178 S.E. 67 (1935), and their progeny. Despite the many and varied interests justices and judges may have in litigation, they have a commitment to the people, a responsibility for administration of justice, and sworn obligation to support the Constitution of the United States and the Constitution of West Virginia and to faithfully discharge the duties of their office. Abdication of these responsibilities is not to be taken lightly. *See Laird v. Tatum*, 409 U.S. 824, 93 S. Ct. 7, 34 L. Ed. 2d 50 (1972), as case wherein Justice William H. Rehnquist refused to disqualify himself from participation in litigation before the United States Supreme Court.

### Motion on Depositions

By his motion filed on May 11, 1978, respondent moved "the Court to set a schedule for the taking of depositions in this case." In paragraph XIII of respondent's First Defense in his Answer he "avers that the taking of evidence on numerous issues will be necessary for the proper disposition of this case." On May 12, 1978, counsel for relators filed "The Opposition of Petitioners to Respondent's Motion that the Court Set a Schedule for the Taking of Depositions," asserting that the case presents "no disputes of material fact, the only issues raised by the Respondent's denials and affirmative allegations, if admitted, being immaterial and peripheral to the gravamen of the petition and therefore having no potential effect upon the relief sought." On the other hand, in his

motion, respondent expressed the belief "that the taking of evidence is essential for respondent to properly develop the defenses raised in his answer" and filed, on May 17, 1978, his Reply to relators' Opposition, stating his position. By order of May 17, 1978, the Court, "reserving unto itself the questions of the materiality and admissibility of the evidence to be derived from the taking of such depositions, is of opinion that counsel should be permitted to develop the issues which they deem pertinent and does hereby grant said motion to fix a schedule for the taking of depositions." The schedule was accordingly set in the order, and counsel were permitted to proceed with the contemplated depositions.

We have reviewed the entire record in this litigation and have carefully considered the oral and written arguments of counsel for the respective parties. We have given studied attention to the facts asserted in relators' petition and to the defenses interposed by respondent. Many incidental issues raised in the record are without substance and provide no bases for determination of the basic and controlling issue to be decided by the Court. Diligent examination of the record discloses no lack of adequate and substantial factual development for disposition of the case apart from the evidence adduced and presented by way of depositions.

Relators filed their Demurrer and Reply to respondent's Answer. Rule 81(a)(5), Rules of Civil Procedure; *Wilson v. County Court of Logan County*, 150 W. Va. 544, 14 S.E.2d 353 (1966).

### Respondent's Defenses

Respondent's First Defense admits relators' allegations concerning provisions of Article VI, Section 51, of the Constitution, which include the pertinent language "that no item relating to the judiciary shall be decreased" by the Legislature. The defense states "that said provisions speak for themselves." No issue as to the language and meaning of the provisions of the Constitution appears. In this defense and in his Second Defense respondent refers to the West Virginia Code, 5A-2-7, and asserts that the State Auditor "never certified" the

judicial budget request to the Governor—that as a consequence the judicial budget request "was never constitutionally before the Legislature during the 1978 Regular Session." The record shows that the Judiciary's budget was transmitted to the State Auditor, was processed through the Budget Division of the Department of Finance and Administration, and was included in the state's budget as transmitted by the Governor to the Legislature on January 11, 1978. Acceptance of the judiciary budget request as a part of the state's budget by the Legislature and its extensive work thereon, as reflected by the record, strongly indicate that the Legislature considered the judicial budget request was constitutionally before it for consideration and action. The record discloses that the Judiciary furnished to the Legislature, immediately before and during the 1978 session, additional materials whereby the Legislature might ministerially and administratively modify the judicial budget request depending on constitutionally enacted legislation relating to judicial salaries and services. Other parts of respondent's First Defense will be considered herein later. We find the First and Second Defenses untenable.

The Third Defense asserts that the judicial budget request "was improper, unreasonable, and constituted an abuse of discretion." Respondent asserts that the budget "requested unreasonable amounts or increases" not "reasonably necessary for the maintenance and functioning of the court system." For these reasons, he asserts, the "Judicial Budget Request lost any constitutional protection it may otherwise have had." The Judicial Reorganization Amendment was drafted and proposed by the Legislature in 1974 and was approved by the voters at the 1974 general election. The amendment called for a "unified court system which assures the prompt and efficient administration of justice in West Virginia." The Supreme Court of Appeals was given general supervisory control over the state's entire court system. The salaries of justices and judges are subject to legislative action. Salaries of circuit court judges are

wholly paid by the state, without compensation paid in part by county commissions. Justices of the peace and the fee system were phased out and a completely new program of magistrates with clerical help, facilities and equipment was provided. The office of administrative director was created by the amendment for managerial services for the state's entire judicial system. Probation services in the counties were brought under the court program. The prompt and efficient administration of justice contemplated better library facilities, training and educational programs, and the prompt and effective disposition of the increasing number of criminal and civil cases crowding the dockets. These and other factors necessitated increases in appropriations for the Judiciary. Respondent states that the 1978-1979 judicial budget request is "not reasonably necessary for the maintenance and functioning of the court system"—that the request "constituted an abuse of discretion" causing it to lose "any constitutional protection it may otherwise have had." In *State ex rel. Brotherton v. Blankenship,* \_\_\_ W. Va. \_\_\_, 207 S.E.2d 421 (1973), before the Judicial Reorganization Amendment was adopted, the Court held:

> The judiciary department has the inherent power to determine what funds are necessary for its efficient and effective operation.

The question of the inherent power of the courts to determine what funds are necessary for their efficient and effective operations has been elsewhere considered. *See* Note, "Judicial Power—The Inherent Power of the Courts to Compel Funding for Their Own Needs," 53 Wash. L. Rev. 331-348 (1978).

The West Virginia Constitution requires the judicial branch of the government to prepare its budget request and provides that "no item relating to the judiciary shall be decreased" by the Legislature. In this state the inherent power of the judiciary to determine what funds are necessary for its efficient and effective operations is substantiated by express provisions of the Constitution. We adhere to the ruling in the *Brotherton* case and find no merit in respondent's Third, Seventh and Tenth De-

fenses, all relating to budget making powers of the Legislature and limitations thereon.

Counsel for relators and for respondent have directed much of their written and oral arguments to the plain and accepted propositions that the Constitution provides for a separation of the powers of government and that the appropriation of funds for government operations and services and the enactment of the budget bill are functions and responsibilities of the Legislature. The wheat must be sifted from the chaff. A deficit budget, an expressed fear of respondent, and the "proportionate reduction" of other revenue appropriations, as advanced by relators as a possible remedy for a deficit budget, are not issues for determination and decision at this time. Even if these propositions were for consideration and determination in this case, it appears that respondent's witness, Legislative Auditor Encil Bailey, has, in his deposition testimony, cleared the atmosphere. He has testified that, when the budget bill for fiscal year 1978-1979 was enacted by the Legislature, revenue estimates as presented by the Governor exceeded appropriations by $864,516; that the Governor vetoed two line items in the budget bill totalling $950,000; that the surplus and the vetoed items total the sum of $1,814,516 now available for appropriation by the Legislature; that the Legislature in the budget bill appropriated $12,741,034 for the Judiciary which sum is $1,794,600 less than the $14,535,634 sought by the relators in this mandamus action for the Judiciary's Account No. 111 in the state's 1978-1979 budget bill; and that since the additional sum of $1,794,600 sought for the Judiciary budget is less than the $1,814,516 now available for appropriation by the Legislature, the Legislative Auditor affirmed "there would not be a deficit budget."

Counsel for respondent argues that "It is fundamental that mandamus will not issue to compel the doing of an unlawful act." Relators respond that mandamus is here sought to nullify and prevent the commission of an unlawful and unconstitutional act by the Legislature and to compel respondent, an officer of the Legislature, to

take lawful and constitutionally required action to cure and correct the unconstitutional action attempted to be effected by the Legislature. If the laws of the state require that appropriation figures in the budget bill be corrected, the corrective action by respondent is action required by law—not a revision or rewriting of any parts of the budget bill by the Court.

Respondent argues that the Constitution permits reduction of the judicial budget request "so long as it is not reduced below the amount appropriated in the previous budget bill" and that the words "as provided by law," appearing in the 1968 budget amendment to the Constitution, Article VI, Section 51, Subsections B(3) and D(9), justify this position of and the action by the Legislature. The Court is unable to follow and accept respondent's reasoning in view of the language in the budget amendment "that no item relating to the judiciary shall be decreased" which plainly refers to the budget request then being considered by the Legislature pursuant to the Constitution for operations of the state government for the next fiscal year.

Counsel for respondent argue that "Even if the constitutional provision in Subsection B(5) of the Modern Budget Amendment is construed as a literal prohibition against reduction of a proper Judicial Budget Request by the Legislature, we disagree with the contention that any amount the Judiciary requests—no matter how high or no matter what the purpose—must be granted by the Legislature." Such arguments attempt to mark a dangerous path along which legislators may not safely travel. The Legislature in 1968 submitted the Modern Budget Amendment to the people and the voters adopted the amendment containing the prohibition "that no item relating to the judiciary shall be decreased" in the Legislature's enactment of the annual budget bill. The language is a part of the Constitution and is a limitation on the "power of the purse." In our democracy the Constitution may be amended by vote of the people, but not by action of the Legislature as disclosed by the record relating to the processing and enactment of Account No.

111, the Judiciary's part in the state's 1978-1979 budget bill.

Respondent expresses legislative concern on whether the Judiciary's budget requests are to be granted "no matter how high or no matter what the purpose." The mandate of the people expressed in the Constitution has not left that decision to respondent or to the Legislature. The justices, judges and magistrates are elected by vote of the people. The Legislature determines their salaries. The Legislature may propose amendments to the Constitution and the people may adopt or reject the amendments when submitted to vote. The work load of the Judiciary emerges primarily from legislation and rules and regulations promulgated pursuant to legislation. The Legislature determines revenue sources and amounts and annually adopts a state budget detailing appropriations for governmental operations and services. In the ever-increasing totals of the state's budget, the Judiciary, one of the three basic branches of government, is allocated a relatively small fractional part of the appropriated funds, even though the 1974 Judicial Reorganization Amendment to the Constitution, proposed by the Legislature and adopted by the people, added substantial duties, responsibilities, functions and services to the judicial department's program, along with constantly increasing civil and criminal litigation at all levels of the state's unified court system. The people have expressed their trust in their elected justices, judges and magistrates and have provided a limitation in the Constitution prohibiting decreases in items of the Judiciary's budget requests submitted to the Legislature. In our system of government the people by their vote may amend the Constitution, when proposed amendments are properly submitted, and may elect justices, judges and magistrates of their choice. Likewise members of the Legislature are elected by the people and take an oath to support the Constitution. Counsel for respondent in this action states that the Legislature believes the 1978-1979 judicial budget request was "un-

reasonable and lacking in restraint" and for this reason the Legislature was justified in decreasing items in the Judiciary's budget contrary to and in violation of an express prohibition in the Constitution. In an ordered society wherein the rule of law prevails, the position is not acceptable.

Respondent's Fourth, Fifth and Sixth Defenses are related and will be considered together. The Fourth Defense errs in stating that, since "the Judicial Budget Request for the fiscal year 1978-1979 was never revised," granting the prayer of the petition "would require the printing of the unrevised budget request for the fiscal year 1978-1979; namely, $14,911,054." The petition's prayer is that the constitutionally true and correct judicial budget totalling the sum of $14,535,654 be printed in the Budget Bill. Line items 2, 3, 4, 5, and 6, as contained in the judicial budget request, would remain the same in the constitutionally true and correct budget to be printed in the Budget Bill, but line item 1 in the original budget request would be corrected to the sum of $10,103,054. This is elementary mathematics—subtraction and addition. By separate letters of December 5, 1977, the Chief Justice of the Court communicated to the President of the Senate, the Speaker of the House of Delegates, the Chairman of the Senate Finance Committee, and the Chairman of the House Finance Committee the necessity of the downward revision of the judicial budget request by the sum of $568,000 in the event the Legislature did not enact proposed salary increase legislation for the justices and judges of the state's courts. Since the salary increase legislation was not enacted, the judicial budget request was revised downward by subtracting the $568,000 from line item 1 in the budget request, leaving the line item 1 request at $9,910,454. The Legislature enacted legislation providing increases for the magistrates and their clerks. These increases are shown to be $192,000 which, added to the revised line item 1 figure, would make a line item 1 budget total of $10,103,054 for the 1978-1979 judicial budget. The other

line items in the judicial budget request remain unchanged. The result is a total judicial budget of $14,535,654 to be entered, printed and published in the state's 1978-1979 fiscal budget as Account No. 111 in the Budget Bill enacted by the Legislature.

Respondent asserts in his Fourth Defense such upward revision of the judicial budget appropriations would create a deficit budget for fiscal year 1978-1979 in violation of the Constitution, Article VI, Section 51, Subsection B(5). In his Fifth Defense he asserts "that only the Legislature may enact appropriations by law." In his Sixth Defense he asserts that "Petitioners have no clear legal right, and respondent has no corresponding legal duty, to print the Budget Bill with the figure requested by petitioners, which figure was neither requested by the Judiciary nor enacted by the Legislature." Enactment of legislation, including budget appropriations, is clearly the province of the Legislature, but subject always to limitations and requirements of the Constitution. The judicial budget figures here involved were requested by the Judiciary. Line item 3 of the judicial budget as included in the Budget Bill enacted by the Legislature is identical with line item 3 in the initial judicial budget request. Line items 2, 4, 5, and 6 in the initial judicial budget request, as included in the Budget Bill presented by the Governor to the Legislature, were decreased by the Legislature in violation of the Constitution which provides that "no item relating to the judiciary shall be decreased." These line items requested by the Judiciary must, under the Constitution, replace the line items attempted to be placed in the Judiciary's budget made a part of the state's Budget Bill enacted by the Legislature. Likewise line item 1 in the original judicial budget request, revised downward by the Judiciary and constitutionally increased by the Legislature, as above detailed, must, under the Constitution, replace line item 1 in the judicial budget made a part of the 1978-1979 Budget Bill as enacted by the Legislature. These line item replacements are not effect-

ed by judicial action but by the Constitution which so requires and by a lawful statute mandatorily requiring a responsible officer of the Legislature to prepare, print and publish the true and correct state budget for fiscal year 1978-1979 as enacted in the Budget Bill passed by the Legislature. The action required of respondent is action in the discharge of a ministerial duty imposed by the Constitution and by statute.

In respondent's Fourth Defense and in his Motion that the Court Set a Schedule for the Taking of Depositions and in arguments of counsel for respondent, the question is presented whether a deficit budget may be created if the Judiciary's budget is revised upward in the Budget Bill as enacted for fiscal year 1978-1979. In paragraph 3(c) of respondent's motion to take depositions, reference is made to "printing of the Court's original and unrevised Budget Request." As above noted the Court's original budget request has been revised and relators in this action seek to have the revised budget figures printed in the Judiciary's budget constituting a part of the state's Budget Bill enacted by the Legislature. It will be recalled that the Constitution, Article VI, Section 51, Subsection B(5), provides that the "legislature shall not amend the budget bill so as to create a deficit but may amend the bill by increasing or decreasing any item therein: Provided, That no item relating to the judiciary shall be decreased." The issue of a deficit budget is not now before the Court for decision. If it later develops that a deficit budget results from unconstitutional action by the Legislature, provision is made in the Constitution for convening the Legislature for consideration of and action on a constitutional Budget Bill for fiscal year 1978-1979. Certainly it will not be contended that a mandate of the Constitution can be sacrificed and violated in order to avoid a deficit budget. Revenue estimates are subject to calculations and changes. Many proposed appropriation items in the budget bill may be increased or decreased to adjust to revenue estimates presented to the Legislature by the Gov-

ernor. The "Modern Budget Amendment" was drafted and proposed in 1967 and 1968 with some members of the 1978 Legislature participating therein. Less than 10 years ago the voters adopted the amendment containing the mandate that "no item relating to the judiciary shall be decreased." Certainly the respondent's views as indicated in this action are not the prevailing views of the current legislators—that a clear mandate of the Constitution may be ignored and violated in order to avoid a deficit budget when the Constitution provides other ready means through changes in revenue estimates and appropriations to compose and enact a constitutional Budget Bill for the state. As above stated, the record herein indicates that the state's budget for fiscal year 1978-1979, as constitutionally enacted and determined, will not be a deficit Budget.

Respondent's Eighth and Ninth Defenses are presented in the alternative. The Eighth Defense demurs to the petition, stating that it is "insufficient in law and fails to state facts upon which relief can be granted." The Ninth Defense asserts "In the alternative, respondent avers that the Legislature substantially complied with any and all requirements of the Constitution relative to the budget of the Judicial Department." Even though respondent verifies these and other defenses, we are impressed by the facts established in the record, including legislative action on the judicial budget request.

Respondent's Eleventh Defense asserts that the "Judicial Department consented to the action of the Legislature in decreasing Account No. 111 and thereby waived any constitutional immunity it might otherwise have had." As a defense, the assertion is untenable. It admits the Legislature decreased the judicial budget, Account No. 111. It asserts that the Judiciary consented to the Legislature's action decreasing Account No. 111. The Chief Justice of the Court, by his letters of December 5, 1977, to the President of the Senate, the Speaker of the House, the Chairman of the Senate Finance Committee, and the Chairman of the House Finance Committee, re-

vised the judicial budget downward by $568,000, the amount of the original budget request for increased salaries for justices and judges, in the event the Legislature did not amend the judicial salary statutes providing for the increased salaries. Otherwise the record discloses no judiciary consent to any decreases in the judicial budget request. In addition to the weakness of respondent's Eleventh Defense, it weakens further his Second Defense that the judicial budget request "was never constitutionally before the Legislature during the 1978 Regular Session." The Eleventh Defense concedes that the judicial budget request was before the Legislature and was decreased.

As previously stated, the basic and controlling issue for decision is whether the Legislature, in its enactment of Committee Substitute for Senate Bill No. 50, as amended, embracing the state appropriations for fiscal year 1978-1979 as requested in the budget bill submitted by the Governor, unconstitutionally decreased line items 1, 2, 4, 5, and 6 in the Judiciary's budget. Clearly the Constitution provides that "no item relating to the judiciary shall be decreased." In *State ex rel. Trent v. Sims* 138 W. Va. 244, 77 S.E.2d 122 (1953), the Court, in point 1 of the syllabus, held:

> If a constitutional provision is clear in its terms, and the intention of the electorate is clearly embraced in the language of the provision itself, this Court must apply and not interpret the provision.

In *State ex rel. State Building Commission v. Bailey*, 151 W. Va. 79, 150 S.E.2d 449, 456 (1966), the Court affirmed:

> It is well settled that it is the duty of a court to endeavor to ascertain a proper basis to sustain a statute when its constitutionality is assailed ... It is equally well established that it is the duty of a court to declare a statute invalid if its unconstitutionality is clear. . . .

In point 3 of the syllabus in *State ex rel. Brotherton v. Blankenship, supra,* the Court held:

Article 6, Section 51 of the West Virginia Constitution, when read in its entirety, shows a clear intent on the part of the framers thereof and of the people who adopted it to preclude both the Legislature and the Governor from altering the budget of the judiciary departments as submitted by that department to the Auditor.

The record shows that the six line items in the Judiciary's budget were not changed by the Governor, but that line items 1, 2, 4, 5, and 6 were decreased by action of the Legislature in its processing and enactment of the state's budget bill for the 1978-1979 fiscal year. Respondent's answer, eleven defenses, motions and other presentations to the Court do not in fact deny that the Legislature did effect the decreases in the five line items of the Judiciary's budget. He presents excuses, reasons and justifications for the decreases. We have carefully weighed his excuses, reasons and justifications and find them unconvincing. The record establishes relators' clear legal right to the relief sought in their petition for a writ of mandamus and respondent's clear legal duty to comply with the requirements of the writ. *State ex rel. Browning v. Blankenship*, 154 W. Va. 253, 175 S.E.2d 172 (1970). In point 3 of the syllabus in *State ex rel. Greenbrier County Airport Authority v. Hanna*, 151 W. Va. 479, 153 S.E.2d 284 (1967), the Court held:

Mandamus lies to require the discharge by a public officer of a nondiscretionary duty.

Respondent is the Clerk of the House of Delegates of the West Virginia Legislature whose nondiscretionary duties are clearly defined and prescribed by law. W.Va. Code, 4-1-13. His duties in this litigation are clearly indicated by the Court's findings and conclusions summarized in the following parallel columns of words and figures setting forth the judicially proposed budget, the legislatively enacted but unconstitutional budget, and the constitutionally required budget in Account No. 111 of the 1978-1979 fiscal year budget for the State of West Virginia.

## JUDICIAL
### 4—Supreme Court—General Judicial
### Acct. no. 111

| Line Items in Budget | Budget Submitted by Judiciary | Unconstitutional Budget Adopted by Legislature | Constitutional Budget Required to be Published |
|---|---|---|---|
| 1 Personal Services | $10,478,454 | $9,177,634 | $10,103,054 |
| 2 Other Expenses | 1,562,600 | 962,400 | 1,562,600 |
| 3 Judges' Retirement System | 750,000 | 750,000 | 750,000 |
| 4 Other Court Costs | 1,770,000 | 1,684,000 | 1,770,000 |
| 5 Judicial Training Program | 100,000 | 50,000 | 100,000 |
| 6 Law Libraries Program | 250,000 | 117,000 | 250,000 |
| TOTALS | $14,911,054 | $12,741,034 | $14,535,654 |

Upon thorough consideration of the record, the arguments and presentations of counsel, and the laws and principles of law controlling disposition of the proceedings, we find and conclude that the Legislature acted in violation of the West Virginia Constitution and the mandate of the people expressed therein by decreasing line items in the Judiciary's budget for fiscal year 1978-1979. The relators are entitled to the relief sought in these proceedings and accordingly the writ of mandamus requiring respondent, C. A. Blankenship, Clerk of the House of Delegates, to perform his nondiscretionary duty as prayed for is awarded.

While Justice Wagner concurs generally in the Court's opinion, he briefly and separately states his views that, inasmuch as four Justices of the Court voluntarily recused themselves from participation in the deliberations and decision in this case, Justice McGraw might well have likewise recused himself, although, under West Virginia law, he is not required to do so and may not be disqualified from participation and decision.

Justice Duffield states briefly and separately his views that it is the constitutional obligation and duty of Justices to serve faithfully in the office to which they have

been elected, but that they may recuse themselves, as a matter of personal judgment and discretion. When four Justices of the Court recused themselves, Justice McGraw might well have joined in the recusal, but was not obliged to do so, and, under West Virginia law, he is not disqualified from participation in the deliberations and decision in this case.

Justice McGraw abstained from the designated Court's consideration of and rulings on the motion to disqualify him from participation in the deliberations on and decision in the case. Because of scheduled conferences and other duties, commitments and obligations of the permanent Court, Justice McGraw was necessarily absent from the final deliberations and decision of the designated Court in this case, but concurs and joins in the designated Court's decision and opinion herein.

*Writ awarded.*