442 So.2d 757 (1983)
Robert L. "Bobby" FREEMAN, et al.,
v.
David C. TREEN, Governor of the State of Louisiana, et al.
No. 83-CA-0988.
Court of Appeal of Louisiana, First Circuit.
November 23, 1983.
*759 P. Raymond Lamonica, and H. Alston Johnson, III, Baton Rouge, for defendants-appellants, David C. Treen, E.L. "Bubba" Henry, and Willard A. Favre.
Cynthia Young, Baton Rouge, for defendant-appellee, Mary Evelyn Parker.
John L. Avant, Baton Rouge, and L. Phillip Canova, Plaquemine, for plaintiffs-appellees, Robert "Bobby" Freeman, et al.
Before COVINGTON, EDWARDS, SHORTESS, CARTER and ALFORD, JJ.
EDWARDS, Judge.
In this appeal we are to decide only whether the trial court correctly issued a preliminary injunction in connection with a suit for declaratory and permanent injunctive relief. The issue involves essentially procedural rather than substantive questions. We mention this distinction to stress that the substantive issue in the main demand concerning, broadly, constitutional limitations both on the exercise of the Governor's veto power and on judicial review of actions by a co-equal branch of government, though tentatively considered, are not decided.
The following facts are undisputed. As required by Article VII, section 11 of the Louisiana Constitution, Governor David C. Treen (Gov. Treen), submitted to the legislature an executive budget in House Bill 158, commonly referred to as the General Appropriation Bill, later enacted into law as Act No. 14 of the 1983 regular session of the legislature. That bill provided a total of $411,907.00 available to the office of Lieutenant Governor in four separate categories or "line items"Salaries Continuing, $247,869.00; Other Compensation, $7,000.00; Related Benefits, $50,024.00; Operating Expenses, $107,014.00in the budget unit numbered 04-05-00. The budget made provisions for a staff of 11 employees.
After passage of the bill by the House, Lieutenant Governor Robert L. "Bobby" Freeman (Mr. Freeman) persuaded the Senate Finance Committee to increase the salaries continuing item by a lump-sum amendment of $133,637.00, raising the total to $545,544.00 with 15 employees. Mr. Freeman admitted the amount was added so as to preclude a gubernatorial line item veto of the additional funds. When informed that the increase was not in proper item form, Gov. Treen wrote Mr. Freeman advising *760 him that his office could not be wholly exempt from budget cuts.
The House refused to concur in the Senate amendment, and the bill was sent to a conference committee composed of three House and three Senate members. At the committee meeting, a compromise amendment, proposed by Gov. Treen, adding $66,819.00, or half of Mr. Freeman's amendment, to the salaries item, was introduced but defeated by a three-to-three vote, split between the House and Senate members. With the original amendment intact, the bill was subsequently passed by the legislature, leaving the new total of $545,544.00 appropriated to the Office of the Lieutenant Governor.
Upon receipt of the bill, Gov. Treen vetoed the salaries continuing item totalling $381,506.00.[1] He explained to Mr. Freeman that because LSA-R.S. 39:57(B),[2] commonly referred to as the "BA-7" transfer, prohibits transfers of funds from salary categories to other categories, he could not veto a smaller amount in another item in order to have a lesser effect on the budget. Therefore, his only option was to veto the salaries item. However, because the BA-7 transfer allows transfers from other item categories to salary categories, he agreed to assist Mr. Freeman in procuring the salaries for his staff employees. Moreover, as a constitutional officer with a protected salary, Mr. Freeman could draw his pay on his own warrant under LSA-R.S. 49:202.[3]
Thus, after the veto, $164,038.00 plus the $63,367.00 payable as salary to Mr. Freeman on his own warrant, for a total of $227,405.00, remained available in the operating budget of the Office of Lieutenant Governor.
Nonetheless, alleging the effective abolition of his office, Mr. Freeman and two others[4] sued to have declared and permanently enjoined as unconstitutional the gubernatorial line item veto of the salaries continuing item from the operating budget of his office for the fiscal year 1983-84. He included in his petition a prayer for a preliminary injunction.
On August 19, 1983, after a hearing on the preliminary injunction, the trial court held the contested veto unconstitutional and issued a preliminary injunction prohibiting the defendantsGovernor David C. Treen; Commissioner of the Division of Administration, E.L. "Bubba" Henry; State Treasurer Mary Evelyn Parker; and State Executive Fiscal Program Director, *761 Division of Administration, Willard A. Favrefrom in any way honoring the veto. The trial court denied both the defendants' motion for a stay of the preliminary injunction pending appeal and their motion for a suspensive appeal. These rulings effectively reinstated the vetoed funds and mandated their expenditure from the state treasury.
On August 25, 1983, defendants devolutively appealed the issuance of the preliminary injunction and applied to this court both for a remedial stay of the preliminary injunction pending appeal and an expedited hearing. Under our supervisory jurisdiction, we granted a peremptory writ ordering the preliminary injunction stayed pending appeal and set hearings on the appeal for January 4, 1984.
Seeking either a reversal of the stay order or an earlier docket date for the appeal, Mr. Freeman applied to the Supreme Court for a writ of review. On September 30, the Supreme Court, 438 So.2d 580, granted the writ, remanded the case to this court and directed us to "hear arguments within fifteen days and to decide the case expeditiously." Pursuant to that order, we set hearings on the appeal for October 12, 1983, before a five-judge panel.
It is well-settled that a party may obtain permanent injunctive relief in an ordinary proceeding upon a showing of irreparable injury, loss or harm unless some specific provision of law otherwise provides such relief. During the pendency of the main demand, a party may also obtain by summary process a preliminary injunction. The issuance of a preliminary injunction lies within the discretion of the trial court, but that discretion is reviewable if erroneously exercised. LSA-C.C.P. art. 3601; Smith v. West Virginia Oil & Gas Co., 373 So.2d 488 (La.1979). For several reasons we think the trial court erroneously issued the preliminary injunction in this case.
First, a preliminary injunction may issue only upon a prima facie showing, either by ordinary proof or by verified petition or affidavits, that the plaintiff will prevail on the merits and that irreparable injury or loss will result without the preliminary injunction. General Motors Acceptance Corp. v. Daniels, 377 So.2d 346 (La. 1979); Melancon v. Assumption Parish Police Jury, 231 So.2d 690 (La.App. 1st Cir.1970). Mr. Freeman failed to make a prima facie showing either that the veto was unconstitutionally exercised or that it resulted in irreparable harm to the Office of Lieutenant Governor.
Mr. Freeman contends that at the time of the veto his office was effectively abolished because there were no obligatory funds available to pay his staff, which he reduced from a total number of fifteen to five as a result of the veto. He argues that because the BA-7 transfer can only be made with a joint approval of the Division of Administration and the Legislative Budget Committee, of which he is the Chairman, his office would be required to operate on staff funding provided solely within the discretion of another agency. In short, without a specific and irrevocable appropriation of funds for salaries, Mr. Freeman argues he is without sufficient funds to perform his constitutional functions as Lieutenant Governor.
The Lieutenant Governor has limited constitutionally mandated duties: he is to serve ex-officio as a member of each committee, board, and commission on which the Governor serves, and is to act as Governor whenever the Governor is temporarily absent from the state. LSA-Const. Art. IV. sections 6, 19.
To accomplish these duties, in addition to the $164,038.00 available for operating expenses, the Office of the Lieutenant Governor has access to various support services, without cost to his office, including office space in the state capitol, utilities, an apartment in the Pentagon building, security and chauffeur services from the Department of Public Safety, and use of the State-owned airplane and helicopter. See LSA-R.S. 49:202.1.
Moreover, Mr. Freeman produced no evidence demonstrating any difficulty in *762 transferring funds to salaries by way of the BA-7 transfer system. At the time of the hearing, he had requested and received two BA-7 transfers placing $77,000.00 in the salary fund of his operating budget. The record contains no evidence of anticipated difficulty in obtaining future transfers.
His office is currently operating with a staff of five employees. He testified that he has successfully performed his constitutional duties in spite of the veto.
These facts do not support a showing that the Lieutenant Governor is without sufficient operating funds to perform his constitutional functions, nor do they demonstrate the effective abolition of his office by virtue of an unconstitutionally exercised veto.
Mr. Freeman further argues that the alleged unconstitutional veto unlawfully interfered with his ability to discharge his constitutional duties. Specifically, he argues that the veto deprived him of any means by which to retain the staff of his own choosing, with resulting irreparable harm.[5]
The "irreparable injury" justifying the issuance of a preliminary injunction must be a loss sustained by an injured party which cannot be adequately compensated in money damages or for which there is no pecuniary standard for damage measurement. Terrebonne Parish Police Jury v. Matherne, 405 So.2d 314 (La.1981). Moreover, "injunctive relief should not be granted unless facts supporting its justification are clear and convincing, and rules governing the use of injunctive process are strictly construed." Olsen v. City of Baton Rouge, 247 So.2d 889, 893 (La.App. 1st Cir.1971).
Mr. Freeman testified at the hearing that his office presently employs five staff employees of his own choosing. He acknowledged that he had requested and received two BA-7 transfers placing a total of $77,000.00 in the salary fund of his operating budget. He admitted that with these transfers he had sufficient funding to operate his office at current salary levels until February of 1984.
According to Mr. Mark Drennan, Mr. Freeman's Expert Legislative Fiscal Analyst, if there are no further BA-7 transfers, the salary fund would be exhausted in January of 1984. If additional transfers are made, deducting $3,000.00 a month for operating expenses, the funding for salaries at current levels would run out in March of 1984. He testified, however, that a reasonable person might conclude that the Lieutenant Governor could perform his duties with a staff of only three employees.
*763 He also testified that the job could be done with fewer people at lower salaries.
Mr. Drennan testified that the original budget request of $545,544.00 for a staff of fifteen employees was excessive.
These facts do not demonstrate a clear and convincing need for the issuance of a preliminary injunction in order to prevent irreparable harm. The evidence establishes that Mr. Freeman in fact had sufficient funds to retain a staff of five employees at current salary levels until March of 1984 with additional BA-7 transfers. The evidence also establishes that Mr. Freeman could operate his office and perform his duties with a staff of five at lower salaries, for a presumably longer period than March of 1984. Since his office was functioning and would continue to function at least until January, there was no showing of irreparable harm.
Mr. Freeman cites several cases for the proposition that no showing of irreparable injury need be made when the action complained of is in violation of the law. He argues that because the veto was unconstitutional, it is therefore illegal, and he need not show irreparable injury. Each of the cases cited for this proposition, however, involved threatened actions by a municipality in direct violation of a prohibitory law. Those situations are easily distinguishable from the present case.
The case before us involves neither threatened actions involving a municipality nor a direct violation of a prohibitory law. The contested veto is an express gubernatorial power provided for by the constitution. When a constitutional provision is plain and unambiguous, its language must be given effect. Bank of New Orleans & Trust Co. v. Seavey, 383 So.2d 354 (La. 1980). The Louisiana Supreme Court has held that a legislative act constitutional on its face can only be enjoined if unconstitutionally administered or applied. Singlemann v. Davis, 240 La. 929, 125 So.2d 414 (1960). That reasoning applies with equal force to the situation before us. Thus, it was incumbent upon Mr. Freeman to demonstrate the unconstitutionality of the line item veto as exercised and applied. This, we think, he has not done. Absent that showing, the preliminary injunction should not have issued.
There are two additional reasons why the trial court erroneously issued the preliminary injunction in this case. The first reason is based upon the purpose to be served by the issuance of the preliminary injunction; the second, on the concept of separation of powers.
A preliminary injunction is essentially an interlocutory order issued in summary proceedings incidental to the main demand for permanent injunctive relief. It is designed to and serves the purpose of preventing irreparable harm by preserving the status quo between the parties pending a determination on the merits of the controversy. Schwegmann Bros. G.S. Markets v. Louisiana Milk Com'n, 290 So.2d 312 (La.1974). Before issuing the preliminary injunction, the trial court should consider also whether the threatened harm to the plaintiff outweighs the potential for harm or inconvenience to the defendant and whether the issuance of the preliminary injunction will disserve the public interest. Ledet v. Fischer, 548 F.Supp. 775 (M.D.La. 1982); Dumas v. Treen, 551 F.Supp. 1156 (M.D.La.1981).
In the present controversy, the issuance of the preliminary injunction, rather than preserving the status quo, effectively mandated the expenditures of the vetoed funds from the state treasury at a time of declining state revenues and uniform budget cuts. While the plaintiff has ample opportunity to prove his case on the merits after full trial by ordinary proceedings, the State may have little opportunity to recover those funds once spent. Under these circumstances, because the threatened harm to the defendant outweighs the plaintiffs' need for a preliminary injunction, and because the public interest is better served by fiscal restraint, the preliminary injunction should not have been issued.
Moreover, the Louisiana Supreme Court stated in Plaquemines Parish Com'n *764 Council v. Perez, 379 So.2d 1373, 1382 (La.1980):
Because an injunction constitutes a form of active judicial interference with continuing activities, the courts have been very reluctant to grant such a remedy for the actions complained of by those of departments of executive and legislative branches of government, in the exercise of their authority. In Durrett Hardware & Furniture Company v. City of Monroe, 199 La. 329, 340, 5 So.2d 911, 915 (1942), this court noted:
"Under our system of government providing for distribution of powers between the legislative, executive and judicial departments, it is of vital importance that no one department unduly interfere with or hinder any other department while the latter is acting or assuming to act within the scope of the particular powers reserved to it...."
Serious constitutional questions are raised by this controversy: What is the precise amount of money which must be appropriated to the Lieutenant Governor in order to provide him with the practical and effective means for fulfilling his constitutional duties? What is the minimum number of staff employees that a Lieutenant Governor must have to carry out those duties? When may the Governor validly exercise his veto power over such appropriations without disabling the Office of Lieutenant Governor? To the extent these questions are justiciable, they are better answered in ordinary proceedings after a full trial on the merits. In this case, the trial court should not have issued the preliminary injunction based upon a summary resolution of issues of this magnitude.
Since we reverse the trial court's issuance of the preliminary injunction, we will not discuss the propriety of the trial court's refusal to grant defendants a suspensive appeal.
REVERSED.
NOTES
[1] LSA-Const. Art. IV, sec. 5(G)(1) provides in part: "Except as otherwise provided by this constitution, the governor may veto any line item in an appropriation bill. Any item vetoed shall be void unless the veto is overridden as prescribed for the passage of a bill over a veto." (Emphasis added.)
[2] LSA-R.S. 39:57(B) provides:

The expenditures of the budget units for which appropriations are made in the General Appropriations Act and the incurring of obligations to spend money shall conform strictly to the category of expenditures as specified in the appropriations established therein in the budget of each budget unit. The commissioner of administration, with the approval of the Legislative Budget Committee or its successor, is authorized to approve the transfer of funds, except those funds appropriated for salaries, step increases, and merit increases for personnel of the state of Louisiana from one category of expenditure to another, but such transfers shall only be made when sufficient evidence is presented to both the commissioner of administration and the Legislative Budget Committee or its successors, by submitting the request and evidence of the need for the change to both parties at the time of the initial request indicating that the operations of the unit are being or will be impaired without such transfers. All unauthorized transfers from one allotment category to another will be charged against the appropriation for the next year; provided, however, that the division of administration, by unilateral action, may approve the transfer of funds, exclusive of salaries, which in the aggregate do not exceed twenty thousand dollars.
[3] LSA-R.S. 49:202 provides: "The salary of the lieutenant governor shall be sixty-three thousand three hundred sixty-seven dollars per annum, payable monthly on his own warrant."
[4] We do not decide whether the two other petitioners, Mary Olive Pierson and F. Barry Marionneaux, as citizens and taxpayers, have a sufficient connexity to the controversy to support their claim of standing.
[5] Mr. Freeman relies on State ex rel. Brotherton v. Blankenship, 157 W.Va. 100, 207 S.E.2d 421 (1973) and Board of Elementary & Secondary Ed. v. Nix, 347 So.2d 147 (La.1977). In Blankenship, the West Virginia Supreme Court held unconstitutional a gubernatorial veto, similar to the one here, which eliminated all funding to the offices of the Secretary of State and the State Treasury, except the constitutionally mandated salary of the offices, because it left the offices without any effective means by which to operate. In the present case, however, $164,038.00 was provided to the office of lieutenant governor. Blankenship is therefore distinguishable.

In Nix, the Louisiana Supreme Court held unconstitutional the repeal of a certain statute which had allowed the Board of Elementary and Secondary Education to employ and fix the salaries of staff "necessary" to assist the board in administering its affairs. The court said the repeal had the effect of requiring the board to rely upon staff services and personnel selected and employed by the Superintendent of Education, and therefore unconstitutionally infringed upon the board's constitutionally conferred policy-making functions. The court went on to say, however, that "we [do not] mean to imply that the board may unilaterally determine what employees are necessary for its performance of its constitutional function. The legislature, of course, itself has a constitutional power to pass upon requests of state agencies for funding of requested staff...." Nix, 347 So.2d at 156.
Gov. Treen's veto did not have the effect of requiring Mr. Freeman to rely on personnel not of his own choosing; while, at the same time, it is a constitutional power, similar to the legislature's, which allows the governor to pass on certain requests for funding. To that extent, Nix is also distinguishable from the present case. But whether Nix or Blankenship supports Mr. Freeman's argument that his office has been effectively abolished is a decision better made after a full trial on the merits.